**DALLAS FIRE INSURANCE COMPANY, Appellant**

v.

**TEXAS CONTRACTORS SURETY & CASUALTY AGENCY, Tom Young, and Fred Thetford, Appellees.**

No. 2–01–397–CV.

Court of Appeals of Texas, Fort Worth.

Jan. 22, 2004.

Suchocki, Bullard & Cummings, Bernard R. Suchocki, Jerry D. Bullard, Scott A. Cummings, Fort Worth, for appellant.

Barlow & Garsek, James Lanter, Chris D. Collins, Fort Worth, for appellee.

PANEL B: CAYCE, C.J.; GARDNER and WALKER, JJ.

## OPINION

ANNE GARDNER, Justice.

### I.  INTRODUCTION

This suit involves a dispute over commissions to be paid under an agency agreement. Appellant Dallas Fire Insurance Company appeals from a judgment awarding actual damages and attorney's fees against it under article 21.21 of the Insurance Code, based upon jury findings of misrepresentations in violation of the DTPA, and denying recovery on Dallas Fire's counterclaim against the agents for breach of fiduciary duty.

We hold that: the dispute arose out of the "business of insurance" for purposes of article 21.21; Appellees' claims under the DTPA as incorporated into article 21.21 were actionable as tort claims for misrepresentation and were not merely a contract dispute over interpretation of the agreement; legally and factually sufficient evidence supports the jury's findings; and Dallas Fire's causes of action as pleaded by its counterclaim and third-party claim were barred by limitations. Therefore, we will affirm.

### II.  FACTS

#### A.  TCSCA Agency

Fred Thetford and Tom Young formed Texas Contractors Surety and Casualty Agency ("TCSCA") in 1990, to sell contract surety bonds on behalf of Eagle Insurance Company ("Eagle"). Both agents had substantial backgrounds in banking and financial services. TCSCA was appointed by Eagle as a subagency under the Harris & Lightfoot managing general agency to sell performance, maintenance, and payment bonds to construction contractors primarily for commercial and public projects.

Dallas Fire is an insurance company owned by Mike Milam and a partner through their joint ownership of its parent company, Mid–American Indemnity Company. Dallas Fire specializes in commercial general liability insurance. Milam is president and treasurer, as well as half-owner, of Dallas Fire. In 1993, Eagle became financially impaired and ceased doing business. Steve Dahlbo, who had served as president of Eagle for ten years, was hired by Milam to be a consultant for Dallas Fire's parent company because of his previous experience as president of Eagle.

#### B.  TCSCA Agency Agreement

When Eagle ceased doing business, the Harris & Lightfoot agency asked Dahlbo to find a home for their surety bond business. Steve Dahlbo was able to move their book of business to Dallas Fire. Milam thereafter hired Dahlbo to be the Marketing Director of Dallas Fire, primar-

ily to run its newly acquired surety bond business.

TCSCA at first remained a subproducer under Harris & Lightfoot's new agency agreement with Dallas Fire. In the fall of 1993, however, Dallas Fire approached TCSCA to take over Harris & Lightfoot's agency relationship with Dallas Fire. On December 1, 1993, TCSCA entered into an Agency–Company Agreement directly with Dallas Fire.

Initially, TCSCA agreed to a 20 percent straight commission, substantially lower than its agreed commission as subagent for Eagle, to be supplemented by a contingent profit commission as an incentive for better quality business and to provide an opportunity for a greater return. After further negotiations, TCSCA and Dallas Fire reached an amended agreement for commissions, reduced to writing and dated December 28, 1994, retroactive to December 1, 1993. The amended agreement, as reflected in a written Agency Commission Schedule, provided for a straight commission of 27.5 percent and an additional "contingent profit commission" to be computed by a formula. Milam was the signatory for Dallas Fire on both the Agency–Company Agreement with TCSCA and the Agency Commission Schedule.

## C. The Contingent Profit Commissions

The formula specified in the Agency Commission Schedule ultimately negotiated by the parties called for the contingent profit commission to be calculated as 5 percent of all earned bond premiums, decreasing on a sliding scale by ½ percent for each 1 percent increase in the loss ratio above 20 percent. At a loss ratio of 30 percent or more, no commission was owed. The loss ratio was to be computed in the following manner:

1. The sum of paid [and] unpaid loss, loss adjustment, and legal expense, plus
2. Incurred But Not Reported Losses equal to 5% of Enforce Premiums,
3. Divided by premiums earned.

The Agency Commission Schedule required Dallas Fire to compute the contingent profit commission on an annual basis, with any contingent profit commission due TCSCA delivered within 30 days of the end of each calendar year. The commission was subject to change if Dallas Fire's losses and bond expenses increased over time. By letter agreement, the parties also provided for Young to receive an equal amount as a contingent profit commission annually.

For the year ending December 31, 1994, TCSCA received $11,333.00 in contingent profit commission, with Young receiving an equal amount. The 1994 contingent profit commission was approved by Milam before payment to TCSCA and Young. TCSCA provided the figures for the bonds issued and premiums collected but had no involvement in the calculation of the commission amounts. For the next year, ending December 31, 1995, the contingent profit commission was computed to be $58,557.33 for TCSCA with a like amount for Young and was again approved by Milam. Dallas Fire faxed calculations for the commission amounts for 1995, due January 10, 1996, to TCSCA, but deposited the funds in escrow with the consent of TCSCA and Young, because the agency by that time was contemplating discontinuing its business with Dallas Fire, and the parties understood that the figures could change based upon losses in the process of adjustment.

In the fall of 1995, TCSCA had learned that Dallas Fire lacked the capital and surplus to become "Treasury listed" as would be required by proposed legislation affecting bonds for public construction pro-

jects. With the legislation pending, public works entities began insisting on Treasury listed construction bonds, limiting TCSCA's market for further potential sales of Dallas Fire performance and payment bonds. TCSCA advised Dallas Fire in February 1996 that it intended to cease doing business under the Agency–Company Agreement. In June 1996, TCSCA moved its business to another company, American Reliable Insurance Company, and Dallas Fire ceased writing bonds.

### D. Change in Calculating Commissions

It was undisputed that, for both 1994 and 1995, in calculating the amount of the contingent profit commissions due, the only expenses Dallas Fire included in the formula as "loss adjustment expense" were amounts it actually had paid to third parties such as outside adjusting firms and legal expense for claims on bonds sold by TCSCA. However, in 1996, Dallas Fire learned from a new auditor that it could include "unallocated loss adjustment expenses" in its annual statements with the Texas Department of Insurance ("TDI"). Dallas Fire witnesses described "unallocated loss adjustment expense" as a prorated portion of all amounts chargeable to a claim including in-house adjusters' salaries, actuaries' salaries, secretarial services, benefits to employees, office rent, heating, air conditioning, utilities, computers, telephones, postage, accounting support, and other overhead expenses.

Dallas Fire included "unallocated loss expense" for all lines of its business in its annual statements to TDI for the first time in 1996. Having learned that Dallas Fire could apportion the unallocated loss adjustment expense to its various lines of business for reporting purposes, Milam decided that Dallas Fire could also charge those expenses against the contingent profit commissions for TCSCA and Young as "loss adjustment expense" under the formula for computing the contingent profit commissions.

TCSCA had generated a total of approximately $3.4 million in earned premiums for Dallas Fire by 1997. It was undisputed that the bond business had been more profitable for Dallas Fire than any of its other lines of business. However, when Dallas Fire included unallocated loss adjustment expense in recalculating the contingent profit commissions for TCSCA and Young, not only would the agents be due no further contingent profit commissions, but Dallas Fire claimed they owed it reimbursement for all previous contingent profit commissions paid.

By letter from Milam to TCSCA dated January 21, 1997, Dallas Fire informed TCSCA that Dallas Fire would include unallocated loss adjustment expense in the formula for calculating the contingent profit commissions, retroactively to the beginning of their agency agreement. Dallas Fire unilaterally withdrew the commissions previously deposited into escrow and made demand for reimbursement of the previously paid commissions to TCSCA and Young.

### E. This Suit Results

#### 1. Claims asserted

TCSCA filed this suit on May 27, 1998, alleging breach of the Agency–Company Agreement and seeking a declaratory judgment that unallocated loss adjustment expense was not properly included in calculating the contingent profit commissions under the terms of the Agency Commission Schedule. Young intervened for breach of his separate agreement for contingent profit commissions. Dallas Fire counterclaimed on May 14, 1999, alleging overpayment of the previous commissions based on "unjust enrichment" as the result of Dallas Fire's incorrect calculation of the

commissions and asserting a separate claim against Fred Thetford for a personal loan. Subsequently, Dallas Fire added Thetford as a third-party defendant.

After numerous pleading amendments by all parties, the case was tried to a jury on claims by TCSCA and Young: asserting breach of the Agency–Company Agreement and violations of article 21.21 of the Texas Insurance Code based upon misrepresentations by Dallas Fire in violation of section 17.46(b)(12) of the DTPA; and seeking a declaratory judgment. Additionally, the jury considered Dallas Fire's counterclaims, whereby Dallas Fire asserted that, in addition to unjustly benefitting from overpayment of the commissions, TCSCA and Young breached the contract and committed torts including violations of the DTPA and article 21.21, fraud, and breaches of fiduciary duty in failing to furnish a letter of credit, failing to remit all premiums collected, and issuing bonds outside the State of Texas and on projects after work had begun.

### 2. Commission dispute

The main factual dispute at trial concerned how the contingent profit commission was to be calculated under the Agency Commission Schedule. Tom Young testified that, in the negotiations leading to the final agreement for the commission, the parties had discussed the sliding scale for calculation of the commission. Young testified that those discussions included what items would be included as "loss adjustment expense" as that term was used in the formula.

Young testified that, on December 28, 1994, before signing the amended Agency Commission Schedule, he and Thetford inquired what the term "loss adjustment expense" meant in a meeting with Milam and Dahlbo at Dallas Fire's offices. According to Young, Dahlbo explained in Milam's presence that it would include only losses incurred that were directly attributable to "third party costs," that is, expenses actually paid out that could be tied directly to a specific claim on a bond issued through TCSCA. Young testified that Milam did not respond differently.

Young further testified that he and Thetford signed the Agency Commission Schedule in reliance upon Dahlbo's explanation of what items would be included in "loss adjustment expense." Thetford agreed with Young's understanding of the way the contingent profit commissions would be computed. Thetford testified it was never the intent of the parties that the term would include expenses for internal handling of claims or overhead of the company's business. He said he had never heard "unallocated loss adjustment expense" mentioned as being included until January 1997.

The testimony of all witnesses was consistent that the manner in which Dallas Fire computed the contingent profit commissions in 1994 and 1995 did not include unallocated loss adjustment expense, but only the actual amounts paid out for third party adjustment and legal expense. Young and Thetford testified that they continued producing for Dallas Fire based upon the manner in which the contingent profit commissions were computed for the years 1994 and 1995, reflecting the agreement as they understood it, and that they could have moved their business at any time under the agreement and probably would have done so had they known Dallas Fire would later change the calculations of the commissions to include unallocated loss adjustment expense.

Dahlbo testified at trial that he had recommended the concept of the contingent

profit commission for TCSCA.[1] It was not a new idea; it had been part of the Harris & Lightfoot agreement with Dallas Fire, he said, and this was reflected by that agency's previous agreement. He recommended it, brought it up, and "authored" the formula for TCSCA and Young. He generally recalled that contingent profit commission would have been part of the initial discussions with the agents although he could not recall a specific discussion. However, to the best of his knowledge, there was never any intention to include unallocated loss adjustment expense at the time the agreements were entered into with TCSCA and Young.

Dahlbo further testified that he personally calculated the contingent profit commissions for both 1994 and 1995, using only expenses paid to outside adjusters and legal expenses. His understanding was that nothing else was to be included. He prepared the calculations for both years from "loss runs" listing only losses paid and reserves for loss adjustment expense to be paid out and presented them to Milam for his approval. He also gave Milam copies of the computer printouts showing all the numbers that went into the calculations. Dahlbo testified Milam never mentioned unallocated loss adjustment expense as to the figures for 1994.

In December 1995 or January 1996, Dahlbo recalled that Milam told him new auditors reviewing Dallas Fire's records had raised the issue of reporting unallocated loss adjustment expense. Initially, Dahlbo agreed that issue had to do with how the company presented its books to the regulators. At some point, Milam asked him if that would impact TCSCA,

and he told Milam that was an "issue he would have to take up with [the agents]." However, no one at Dallas Fire ever mentioned to Dahlbo that a "mistake" had been made in not including unallocated loss adjustment expense in the 1994 or 1995 commission calculations.

Milam testified that he recalled the subject of the contingent profit commissions coming up in meetings with Young and Thetford before the first agreement was reached and had no recollection of the amended agreement. The exact date and what was said was "foggy." He did not recall specific discussions of the term "loss adjustment." His intent of the contract was for it to be "fair."

Milam denied knowing how the loss adjustment expense was calculated for the contingent profit commissions for 1994 and 1995; however, he acknowledged that he was first advised Dallas Fire could apportion unallocated loss adjustment expense to its various lines of business in its financial reports to TDI in January of 1996, by a consultant he had hired to help the company with its statutory filings. Milam further testified that the formula for apportioning unallocated loss adjustment expenses was first devised in 1996. Dallas Fire apportioned among all their lines of business the "unallocated" expenses, including salaries and benefits of adjusters, actuaries, and secretaries; telephones; equipment; postage; and support for accounting. They then went back and recalculated the contingent profit commissions for TCSCA and Young and included those expenses as related to the bond business for the two previous years.

---

1. In May 1996, Dahlbo resigned as Marketing Director at Dallas Fire to work as an agent at TCSCA, but was asked to leave the agency after four months because Young and Thetford claimed he was not devoting enough time to business. Dahlbo acknowledged they had a "disagreement," but he said he harbored no ill will toward Young and Thetford. Thus, by the time of trial, Dahlbo did not work for any of the parties.

It was between December of 1995 and January of 1996 that Dallas Fire changed the way it calculated those commissions, Milam said. Milam explained that the company wanted to be in compliance with their auditors and the state regulators. He characterized the company's lack of inclusion of unallocated loss adjustment expense in calculating TCSCA's and Young's contingent profit commissions for 1994 and 1995 as an "oversight."

Following an eight-day trial, the jury failed to find that Dallas Fire breached the Agency–Company Agreement. However, the jury found that Dallas Fire knowingly misrepresented the rights, remedies, or obligations of the parties regarding inclusion of "unallocated adjustment loss expenses" in the contingent profit commission calculations, which was a producing cause of damages of $52,641.02 to TCSCA and $82,641.02 to Young.

The jury also found that TCSCA breached the Agency–Company Agreement and committed breaches of fiduciary duty but that no damages resulted to Dallas Fire and, further, that Dallas Fire discovered or should have discovered any breach of contract or breach of fiduciary duty on January 27, 1994, more than four years before the filing of its original counterclaim. Judgment was rendered on the jury's verdict in favor of TCSCA, Young, and Thetford for their actual damages, attorney's fees awarded by the jury, and prejudgment interest. A take-nothing judgment was rendered against Dallas Fire on its counterclaim and third party claim.

## III.  ARTICLE 21.21 CLAIM

### A.  "Business of Insurance"

By its first issue, Dallas Fire contends the trial court erred in overruling its motion for judgment notwithstanding the verdict ("JNOV") on TCSCA's and Young's claims that Dallas Fire violated the DTPA as incorporated into article 21.21 of the Texas Insurance Code.[2] When their claims arose, section 16(a) of article 21.21 provided:

Any person who has sustained actual damages caused by another's engaging in an act or practice declared in Section 4 of this Article to be unfair methods of competition or unfair or deceptive acts or practices in the business of insurance or in any practice specifically enumerated in a subdivision of Section 17.46(b) of the Business and Commerce Code, as an unlawful deceptive trade practice may maintain an action against the person or persons engaging in such acts or practices.[3]

TCSCA and Young alleged Dallas Fire violated section 17.46(b)(12).[4] Tracking the wording of that statute, Jury Question No. 6 inquired as follows:

Did Dallas Fire engage in any unfair or deceptive act or practice that caused damages to Texas Contractors or Young?

"Unfair or deceptive act or practice" means the following:

(a) Representing that an agreement confers or involves rights, remedies or obligations which it does not have or involve.

The jury found in favor of both TCSCA and Young on that question and found, additionally, that Dallas Fire engaged in such conduct "knowingly."

---

2.  TEX. INS.CODE ANN. art. 21.21 (Vernon 2004).

3.  See id. § 16(a).

4.  TEX. BUS. & COM.CODE ANN. § 17.46(b)(12) (Vernon Supp.2004).

The focal point of Dallas Fire's appeal is its contention, presented as subissue (b) of its first issue, that it was entitled to a JNOV on TCSCA's and Young's article 21.21 claims because, as a matter of law, the parties' dispute did not arise out of the "business of insurance" as that term is used in section 16(a) of article 21.21. In reviewing the denial of a motion for JNOV, we consider whether the evidence is conclusive or whether a legal principle applies to entitle the movant to judgment as a matter of law.[5]

Dallas Fire argues that, because TCSCA and Young sold only contract surety bonds, they were engaged only in the "surety bond business," not the "business of insurance," and thus have no cause of action under article 21.21 as a matter of law. Dallas Fire relies on *Great American Insurance Co. v. North Austin Municipal Utility District No. 1*,[6] asserting that the supreme court "held without equivocation that article 21.21 does not apply to the surety bond business." We do not read *Great American* as broadly as Dallas Fire does, to exclude a dispute between insurance agents and an insurer regarding commissions from the "business of insurance" for purposes of article 21.21.

The supreme court in *Great American* stated that the issues in that case involved "the duties and liabilities of a commercial surety *to its bond obligee*."[7] The suit concerned a claim on a performance bond issued by Great American as surety, to a general contractor on a construction project as principal, in favor of a municipal utility district as obligee.[8] When work by a subcontractor was found to be defective, the contractor refused to correct the problem, contending the defect was the result of the utility district's plans and specifications.[9] The utility district demanded that Great American perform under its bond.[10] Great American delayed for several months, requesting additional evidence and legal authority for the utility district's claim, culminating in a suit by the utility district with a judgment on a jury verdict against Great American for breach of good faith and fair dealing, deceptive acts in violation of article 21.21, and breach of contract.[11]

Reversing and rendering judgment in favor of Great American on both tort claims, the supreme court first held that no "special relationship" exists between a surety and its obligee, as distinguished from that between an insurer and its insured under a liability insurance policy, so as to give rise to a duty of good faith and fair dealing similar to that owed by insurers to policyholders as previously recognized by the supreme court.[12] The court then turned to Great American's contention that the legislature did not intend that suretyship be included within the "business of insurance" regulated by article 21.21.[13]

Noting the absence of a definition of "business of insurance" in article 21.21, the

---

5. *See Wal–Mart Stores, Inc. v. Miller*, 102 S.W.3d 706, 709 (Tex.2003); *Mancorp, Inc. v. Culpepper*, 802 S.W.2d 226, 227–28 (Tex.1990).

6. 908 S.W.2d 415 (Tex.1995).

7. *Id.* at 416 (emphasis added).

8. *Id.* at 416–17.

9. *Id.* at 417.

10. *Id.*

11. *Id.* at 417–18.

12. *Id.* at 418 (citing *Aranda v. Ins. Co. of N. Am.*, 748 S.W.2d 210, 212–13 (Tex.1988) and *Arnold v. Nat'l County Mut. Fire Ins. Co.*, 725 S.W.2d 165, 167 (Tex.1987)).

13. *Id.* at 420.

court nevertheless rejected the argument that other portions of the Insurance Code addressing sureties and surety bonds, such as article 1.14–1 entitled "Unauthorized Insurance" (specifically including the sale or issuance of surety and guaranty bonds in the list of acts defined therein as "insurance business"), were determinative of the intended scope of article 21.21 in that case.[14] Instead, the court looked to the history and origin of suretyship, as well as characteristics distinguishing the relationship of insurer and insured from the tripartite relationship between surety, principal, and obligee.[15] In addition to reiterating its previous differentiation between those relationships in rejecting a duty of good faith and fair dealing, the court noted that insurance involves pooling and spreading of risks with no right of indemnity by the insurer against the insured, whereas suretyship allows a full right of indemnity by the surety against the principal, which would be compromised by allowing extra-contractual damages to be recovered by the obligee against the surety.[16]

As we read *Great American,* it was the "unique" rights, obligations, and characteristics of the "suretyship" relationship, as well as the complications that would result from applying article 21.21 to that relationship, that led the supreme court to decline to construe the term "business of insurance" as defined in the statute to include a claim by an obligee against the surety.[17] Unlike *Great American,* this case does not involve a dispute between either an obligee or principal on a bond or Dallas Fire in its capacity as surety. Neither the circumstances out of which *Great American* arose nor the policies underlying the decision involving the specific relationship between surety and obligee are involved here.

Dallas Fire articulates no argument supporting a legislative intent to exclude a dispute arising out of a relationship between an insurance company and its agents and involving commissions from the scope of article 21.21 merely because the product sold was surety bonds, nor does Dallas Fire offer any rationale for extending the holding of *Great American* to the relationship between a commercial surety and its agents arising out of an agency-company agreement. Dallas Fire points to no "unique" rights, obligations, or characteristics of the agency relationship between these parties distinguishing it from any other agency relationship between an insurer and its agents.[18]

TCSCA relies on *Crown Life Insurance Co. v. Casteel,* which holds that an insurer's agent has standing to sue the insurer for misrepresentations under section 17.46(b)(12) of the DTPA as incorporated into article 21.21 because the agent qualifies as a "person," as defined in article 21.21, section 2(a), as "any individual, corporation, association, partnership, ... and any other legal entity engaged in the business of insurance, *including agents,* brokers, adjusters, and life insurance counselors."[19] While we agree with Dallas Fire that *Casteel* is not dispositive, it is instructive because, in construing the term "person" broadly, the court stated it was the legislature's intent that article 21.21 be "liberally construed and applied to promote its underlying purposes," and that a

14. *Id.* at 422–24.

15. *Id.*

16. *Id.*

17. *Id.* at 424.

18. *See id.*

19. 22 S.W.3d 378, 383–84 (Tex.2000) (quoting Tex. Ins.Code Ann. art. 21.21, § 2(a)).

broad interpretation was "consistent with the Legislature's express objective to regulate *all* insurance trade practices to conclude that an insurance agent is a 'person' with standing to sue an insurance company when the agent is damaged by company practices that violate Article 21.21." [20]

By its reply brief, Dallas Fire points out that the 77th Legislature added article 7.20 to the Insurance Code, effective September 1, 2001, to regulate commercial surety companies' handling of claims by bond obligees on construction payment bonds involving public projects.[21] Dallas Fire relies upon the House Bill Analysis's description of the amendment as being necessary in response to the supreme court's holding in *Great American* and as "amend[ing] the Insurance Code to provide that the business of insurance includes the actions of a surety company." [22] The bill analysis also points out that the amendment applies only to surety bonds issued or renewed on or after January 1, 2002.[23]

Essentially, Dallas Fire argues that the legislation specifically included surety companies in the definition because they were not included before the legislation. We agree with TCSCA, however, that the amendment addresses only a commercial surety's duties and liability to its bond obligee in payment of claims. Rather than supporting Dallas Fire's position, we believe the plain language and narrow scope of the amendment in response to *Great*

*American* further supports our interpretation that *Great American* is limited to disputes between a commercial surety and its bond obligee.

We also reject Dallas Fire's reliance upon *Dagley v. Haag Engineering Co.*, which held that Haag Engineering Co., hired to investigate a hailstorm claim under a homeowner's insurance policy, was not engaged in the "business of insurance" under article 21.21 because the case is factually distinguishable.[24] The court held that the *engineering services* provided did not constitute the "business of insurance." [25]

Dallas Fire argues that TCSCA admitted at trial that its only connection with Dallas Fire arose out of the business of selling surety bonds and that there was no evidence that TCSCA sold insurance policies. We note that, in *Insurance Co. of North America v. Morris*, the supreme court held that investment brokers who sold surety bonds on behalf of an insurance company, in the course of marketing leveraged investments, were selling "insurance products" without being licensed by TDI, and that indemnity agreements under the bonds were thus void, where the brokers transmitted the bond applications and indemnity agreements and collected the bond premiums.[26] Thus, they were deemed to be agents of the company under article 21.02 of the Insurance Code, which provides:

**20.** *Id.* at 384 (quoting TEX. INS.CODE ANN. art. 21.21, § 2(a)).

**21.** TEX. INS.CODE ANN. art. 7.20.

**22.** OFFICE OF HOUSE BILL ANALYSIS, H.B. 548, 77th Leg., R.S. (2001).

**23.** *Id.*

**24.** 18 S.W.3d 787, 793 (Tex.App.-Houston [14th Dist.] 2000, no pet.).

**25.** *Id.* The case of *Attorney General of Texas v. Allstate Insurance Co.*, 687 S.W.2d 803 (Tex. App.-Dallas 1985, writ ref'd n.r.e.), also relied upon by Dallas Fire, is likewise not helpful. The Dallas court addressed the definition of "business of insurance" for the limited purposes of federal antitrust law under the McCarran–Ferguson Act, not article 21.21 of the Insurance Code. *Id.* at 806.

**26.** 981 S.W.2d 667, 671–72 (Tex.1998).

Any person who solicits insurance on behalf of any insurance company ... or who takes or transmits other than for himself any application for insurance or any policy of insurance ... or do[es] or perform[s] any other act ... in the making or consummati[on] of any contract of insurance ... shall be held to be the agent of the company for which the act is done.[27]

*Morris* informs us that surety bonds are "insurance products" for the purpose of article 21.02 relating to agent licensing requirements.[28] Additionally, there was evidence that the principal line of business of Dallas Fire is and always has been commercial general liability insurance. The testimony was undisputed that the Agency Company Agreement between TCSCA and Dallas Fire was Dallas Fire's standard form for its agency agreements with agents who would have been engaged in selling such insurance. Moreover, that agreement provided that "[i]t is agreed between the Company and Agent that ... [t]he Agent is ... authorized to: 1. solicit, receive, and transmit to the Company proposals for *insurance contracts, including surety bonds,* for which a premium is specified herein." [29]

Dallas Fire points to evidence that the term "insurance contracts" remained in the contract as a clerical error, but Dallas Fire acknowledges and the evidence shows that Young and Thetford were required to be licensed as insurance agents by TDI to sell surety bonds and that TCSCA was required to be appointed by Dallas Fire to serve as its agent by forms filed with TDI. The application for the agency appointment of TCSCA, signed by the vice presi-

dent of Dallas Fire, stated: "Applicant meets the qualifications of the Texas Insurance Code and the rules and regulations of the Texas Department of Insurance for the type of license applied for."

Auditors from TDI routinely examined TCSCA's books and records at its agency offices. Additionally, there was evidence that Dallas Fire maintained reserves for estimated losses and legal expenses for claims on surety bonds and for its other lines of business. Dallas Fire concedes that TDI is the regulatory agency for the surety bond business.[30] Licenses to solicit and procure surety bonds are insurance agent licenses issued by TDI.[31]

Defending his decision on behalf of Dallas Fire to charge unallocated loss adjustment expense against the agent commissions at issue here, Milam testified that he relied upon the "highly regulated" nature of insurance companies like Dallas Fire, that are subject to annual audits by TDI. Milam's decision in 1996 to begin charging the unallocated loss adjustment expense against the agents' commissions was because "we are governed by the Texas Department of Insurance." Even though nothing in the Agency–Company Agreements specified that the agents' commissions were to be governed by TDI's reporting requirements, Milam said he wanted to be in compliance with those reporting requirements of the auditors and TDI regulators.

When the new auditor in 1996 informed Milam that Dallas Fire could include unallocated loss adjustment expense in its annual reports, he acknowledged "a light went off in [his] head," and he determined

---

27. Tex. Ins.Code Ann. art 21.02; *Morris,* 981 S.W.2d at 672.

28. 981 S.W.2d at 671–72.

29. [Emphasis added.]

30. *See* Tex. Ins.Code Ann. art. 21.14, §§ 2, 4, 5 (Vernon 1981 & Supp.2004).

31. *See id.* § 4.

that those figures could also be included in calculating the agents' commissions.

In accord with the legislature's expressed intent that article 21.21 be construed liberally to promote its underlying purposes and the reasons expressed by the supreme court for concluding that the unique surety/obligee relationship is not governed by that statute, we conclude that *Great American's* holding that a dispute arising out of that relationship does not arise out of the "business of insurance" for purposes of article 21.21 does not extend to this case.[32] We agree with Dallas Fire that the issue is one of law, but we hold that the dispute between TCSCA and Young as agents and Dallas Fire arose out of the "business of insurance" as a matter of law.[33] We overrule Dallas Fire's subissue (b) of its first issue.

### B. Dispute as to Contract Terms

Three of Dallas Fire's other subissues under its first issue are related. Dallas Fire contends that TCSCA's and Young's tort claims for misrepresentations by Dallas Fire sounded only in contract, not in tort; that the claims involved merely a dispute over interpretation of an ambiguous contract term, i.e., "loss adjustment expense," and therefore were not actionable under the DTPA as incorporated into article 21.21; and that, because the jury found Dallas Fire did not breach the Agency–Company Agreement, Dallas Fire was entitled to a JNOV as to the jury's findings of DTPA and article 21.21 liability and

damages. We will address these subissues (a), (c), and (d) together.

■ Dallas Fire first argues that TCSCA's and Young's claims are merely for breach of contract because they claimed only that Dallas Fire violated the DTPA by "including" unallocated loss adjustment expense in the calculations for the contingent profit commissions. Dallas Fire also urges that TCSCA and Young sought and recovered only economic loss, which was the subject of the contract, i.e., the amount of commissions they claimed were due. Thus, Dallas Fire contends the DTPA claims sound only in contract and cannot be recast as tort-based claims under the DTPA and article 21.21.

Dallas Fire principally relies upon *Crawford v. Ace Sign, Inc.*,[34] noting that, although the plaintiff in that case claimed that the defendant was involved in "more than mere nonperformance of the contract" by asserting he made several oral misrepresentations actionable under the DTPA, the supreme court nevertheless held that the case was governed only by contract law, not the DTPA. To hold otherwise, said the court, would "convert every breach of contract into a DTPA claim."[35] Dallas Fire also cites *Ashford Development, Inc. v. USLife Real Estate Services Corp.*, which holds that "[a]n allegation of a mere breach of contract, without more, does not constitute a 'false, misleading or deceptive act' in violation of the DTPA."[36]

TCSCA and Young contend that Dallas Fire has mischaracterized their claims be-

---

**32.** *See* 908 S.W.2d at 424.

**33.** While maintaining that the issue is one of law, Dallas Fire requested and the trial court submitted a jury question asking whether the dispute between TCSCA and Dallas Fire arose out of the "business of insurance." Dallas Fire alternatively asserts in its second issue that there is legally or factually insufficient evidence to support the jury's finding of "yes"

to that question. Having held that the issue is one of law, we need not address Dallas Fire's second issue. *See* Tex.R.App. P. 47.1.

**34.** 917 S.W.2d 12, 13 (Tex.1996).

**35.** *Id.* at 14.

**36.** 661 S.W.2d 933, 935 (Tex.1983).

cause they did not merely complain of Dallas Fire's conduct in "including" unallocated loss adjustment expense. Instead, they maintain that they pleaded and produced evidence that Dallas Fire made affirmative misrepresentations both by verbal statements and by conduct in computing their 1994 and 1995 commissions in accordance with those misrepresentations, which thereby induced TCSCA and Young both to enter into and to continue to produce under the agency agreement with Dallas Fire for two years.

Reiterating our previous discussion of the evidence, Young testified that, prior to entering into the final agreement for the commissions: Dahlbo explained that third party expenses and legal expenses actually paid would be the only costs included as "loss expense," as that term was used in the formula set forth in the Agency Commission Schedule; that Milam, Dallas Fire's president, was present and did not disagree; and that TCSCA and Young relied upon the statements by Dahlbo in entering into the final agency agreement, as well as on the subsequent payment by Dallas Fire of the commissions for 1994 and 1995 in accordance with those statements, in continuing to do business under their contract with Dallas Fire.

Further, Milam testified that not including unallocated loss adjustment expenses in computing the commissions for those first two years was an "oversight" and that the formula was "changed" to include the unallocated loss adjustment expense only in 1996. Milam contradicted himself by testifying that he told Young and Thetford when they signed the Agency Commission Schedule that "loss expense" included unallocated losses, but then testified that there "didn't need to be a discussion," because the agreement "speaks for itself"; it "means what it means," even though unallocated loss adjustment expense was not mentioned in the agreement.

Dallas Fire overlooks the foregoing evidence in the record of misrepresentations concerning the loss adjustment expenses to be included in calculating the commissions, which distinguishes this case from *Crawford*. In *Crawford*, the evidence established only that the defendants represented they would perform under the contract, their nonperformance was alleged as the "misrepresentation," and there was no claim of inducement into the contract.[37] Likewise, in *Ashford*, the court merely held that breach of contract does not constitute a false, misleading, or deceptive act under the DTPA.[38] Those cases are not applicable here where there was evidence that Dallas Fire made affirmative statements constituting misrepresentations that induced TCSCA and Young into the agency contract.

■ We are mindful of the guidelines established by the supreme court as urged by Dallas Fire, that to determine whether a claim sounds in tort or contract, we look to the source of the duty allegedly breached as well as the nature of the remedy sought.[39] In *DeLanney*, the supreme

37. 917 S.W.2d at 13–14.

38. 661 S.W.2d at 935.

39. *See Crawford*, 917 S.W.2d at 13–14 (holding action governed by contract, not DTPA, where failure to fulfill contract duty to publish advertisement, not misrepresentations, caused loss of profits); *S.W. Bell Tel. Co. v. DeLanney*, 809 S.W.2d 493, 494–95 (Tex. 1991) (looking to both source of duty and nature of remedy sought, holding action sounded only in contract where duty arose from contract and only damages resulting was economic loss from failure to perform); *Jim Walter Homes, Inc. v. Reed*, 711 S.W.2d 617, 618 (Tex.1986) (holding action sounded in contract, not negligence, where only damages were loss to subject matter of contract itself).

court also recognized that, when a defendant's conduct would give rise to liability *independently* of whether a contract exists between the parties, a plaintiff's claim may sound in tort.[40] More recently, in *Formosa Plastics Corp. v. Presidio Engineers and Contractors, Inc.*, the supreme court declined to apply *DeLanney* and *Crawford* to preclude a cause of action for fraudulent inducement into a contract.[41] As the court in *Formosa Plastics* points out, Texas law has long recognized the duty, *independent of duties under a contract*, to refrain from inducing another into a contract by fraudulent misrepresentations, despite the fact that the aggrieved party's damages may only be economic losses.[42]

■ *Formosa Plastics* teaches that an independent duty is imposed on the general public to abstain from inducing others to enter into contracts by the use of fraudulent misrepresentations, irrespective of whether the misrepresentations are later subsumed into the contract or whether the damages suffered are only the economic loss related to the subject matter of the contract.[43] Dallas Fire argues that *Formosa Plastics* applies only to fraud and does not extend to DTPA misrepresentations. We disagree.

While recovery under the DTPA is unavailable for simple breach of contract, that is not the case where the contract was obtained by misrepresentations. Numerous cases have applied the rule of *Formosa Plastics* in the context of DTPA claims as well as fraud.[44] We reject Dallas Fire's argument that TCSCA's and Young's claims under the DTPA sound only in contract. Their claims are *not* based on Dallas Fire's failure to perform duties imposed by the contract but on the independent duty imposed by law not to make knowing misrepresentations inducing a party into a contract, irrespective of the fact that the damages claimed constitute only economic losses that were the subject matter of the contract.[45]

40. 809 S.W.2d at 494.

41. 960 S.W.2d 41, 46 (Tex.1998).

42. *Id.* at 46–47.

43. *See id.*

44. *See, e.g., Ken Petroleum Corp. v. Questor Drilling Corp.*, 24 S.W.3d 344, 357 (Tex.2000) (citing *Best v. Ryan Auto Group, Inc.*, 786 S.W.2d 670, 671–72 (Tex.1990) (holding evidence of misrepresentations outside of contract legally sufficient to support claim for violation of DTPA section 17.46(b)(12))); *Clary Corp. v. Smith*, 949 S.W.2d 452, 463–64 (Tex.App.-Fort Worth 1997, pet. denied) (holding duty to refrain from making misrepresentations imposed by law, not contract, supporting DTPA claim); *Bekins Moving & Storage Co. v. Williams*, 947 S.W.2d 568, 577–78 (Tex.App.-Texarkana 1997, no writ) (upholding DTPA claim for misrepresentations regarding additional details of performance inducing plaintiff to accept contract to move her furniture); *Kuehnhoefer v. Welch*, 893 S.W.2d 689, 693 (Tex.App.-Texarkana 1995, writ denied) (upholding DTPA liability based upon misrepresentations to tenants concerning promise of renewal of existing lease with no intent to perform); *see also Harris v. Chang*, No. 01–99–00728–CV, 2002 WL 24581, at *3 (Tex.App.-Houston [1st Dist.] 2002, pet. denied) (not designated for publication) (holding evidence of misrepresentation regarding value of inventory and equipment included in sale of flower shop sufficient to support DTPA claim); *Luera v. Maynes*, No. 07–99–00325–CV, 2000 WL 1051895, at *3 (Tex.App.-Amarillo 2000, pet. denied) (not designated for publication) (holding agreement to repair truck made with no intent to perform stated DTPA claim).

45. We are not holding that we would extend this rule to a misrepresentation not found to have been made knowingly under the DTPA. *See D.S.A., Inc. v. Hillsboro I.S.D.*, 973 S.W.2d 662, 663 (Tex.1998) (refusing to extend to negligent misrepresentation cases *Formosa Plastics's* exception to the independent injury requirement in fraudulent inducement cases).

Dallas Fire argues, however, that TCSCA's and Young's DTPA claims under article 21.21 were based solely on the parties' dispute over the interpretation of a contract term, i.e., the term "loss adjustment," contained in the formula for computing the contingent profit commissions but not defined, which the trial court determined to be ambiguous. Dallas Fire maintains that Texas courts have consistently held that a controversy over a disputed contract term is not actionable as a misrepresentation under section 17.46(b)(12) of the DTPA relied upon by TCSCA and Young. Dallas Fire relies upon *Quitta v. Fossati*,[46] refusing to allow a dispute involving alternative interpretations of a term in a contract to be recharacterized as a claim under DTPA section 17.46(b)(12), and *Group Hospital Services, Inc. v. One and Two Brookriver Center*,[47] holding that disagreements over the interpretation of a contract with uncertain terms were not actionable under that section.

TCSCA and Young distinguish *Quitta*, pointing out that *Quitta* involved an asserted DTPA claim based only on failure to abide by an alleged oral modification of a lease.[48] We agree with TCSCA's and Young's interpretation of *Quitta*, that the case involved "traditional contract notions" because the lessor merely sought performance of the lease, the lessees sought to prove the existence and nature of additional terms of the parties' agreement, and there was no evidence of a false, misleading, or deceptive act under the DTPA.[49]

The court in *Quitta* relied upon *Group Hospital*, which likewise involved a suit on a lease in which tenants merely asserted that their landlord falsely misrepresented its rights to charge for extra air conditioning and electricity, to orally modify the lease, and to bill through a single meter, as the landlord claimed in its suit.[50] The court of appeals held the tenant's claim boiled down to a "controversy over what the lease meant" and that the suit involved nothing more than a contract interpretation, rather than a DTPA violation.[51] Again, no verbal or written misrepresentations outside the terms of the contract were asserted.

We acknowledge that both parties here asserted differing interpretations of the term "loss adjustment expense" as contained in the Agent Commission Schedule and that the term was not defined in the contract, but the allegations and evidence here involved more than a mere dispute over interpretation of a contract term. We are unpersuaded that *Quitta* and *Group Hospital* are dispositive of the DTPA claims asserted here. "[I]ndependently actionable conduct under the DTPA would fall outside the *Quitta* [and *Group Hospital* ] holding[s]."[52] Unlike the claimants in those cases, TCSCA and Young asserted affirmative, verbal misrepresentations outside the terms of the contract. The factual dispute concerned: whether Dallas Fire's marketing director verbally misrepresented that the term "loss adjustment expense" would include only third party and legal expense paid for particular

**46.** 808 S.W.2d 636, 644 (Tex.App.-Corpus Christi 1991, writ denied).

**47.** 704 S.W.2d 886, 888–89 (Tex.App.-Dallas 1986, no writ).

**48.** 808 S.W.2d at 639–40.

**49.** *Id.* at 644.

**50.** *Id.* at 644–45 (citing *Group Hosp. Servs.*, 704 S.W.2d at 889).

**51.** *Group Hosp. Servs.*, 704 S.W.2d at 888–89.

**52.** *Munawar v. Cadle Co.*, 2 S.W.3d 12, 19 (Tex.App.-Corpus Christi 1999, pet. denied) (citing *Quitta*, 808 S.W.2d at 644 n. 4).

bond claims; whether TCSCA and Young were induced into the contract by that misrepresentation; and whether they were induced to continue performing under the contract by the company's subsequent actions.

The parties agree that conduct must involve more than differing interpretations to rise to the level of a misleading or deceptive act sufficient to invoke the DTPA.[53] Whether a claim involves only a breach of contract is a "fact-driven" inquiry, but whether the facts, once ascertained, rise to the level of a DTPA violation is a question of law.[54] Statements constituting an affirmative representation of existing fact, or even a promise of future performance with no present intent to perform, which induces the claimant to enter into the contract, may rise to the level of DTPA violations.[55] For example, in *Parks v. DeWitt County Electric Co-op, Inc.*, the court of appeals held, in part, that verbal assurances by an electric co-operative that it would not remove any trees from the claimant's land that induced them into a contract granting the co-operative a utility easement were actionable as misrepresentations under the DTPA, independent of the contract.[56]

In its reply brief, Dallas Fire argues for the first time that, even assuming there is proper pleading and proof of misrepresentations that are actionable under the DTPA regarding what expenses would be included as "loss adjustment" expense in calculating the commissions, there is no evidence that TCSCA or Young relied on those alleged misrepresentations in entering into the Agency Commission Schedule or that they were a producing cause of the damages found by the jury. But Dallas Fire overlooks Young's and Thetford's testimony that they would probably not have entered into the agreement nor continued in the performance of the agency agreement for two years if they had known Dallas Fire would take a contrary position, and they would have moved their business elsewhere. Young and Thetford both testified to the amount of the damages claimed as the result of the alleged misrepresentations, totaling the same amounts awarded by the jury.

We hold the trial court did not err in overruling Dallas Fire's motion for JNOV because there was some evidence, more than a scintilla, that misrepresentations were made outside the contract that induced TCSCA and Young to enter into and

**53.** See *Crawford*, 917 S.W.2d at 13–14; *Ashford*, 661 S.W.2d at 935.

**54.** *Chilton Ins. Co. v. Pate & Pate Enters.*, 930 S.W.2d 877, 890 (Tex.App.-San Antonio 1996, writ denied) (citing *La Sara Grain Co. v. First Nat'l Bank of Mercedes*, 673 S.W.2d 558, 565–66 (Tex.1984)).

**55.** *Ken Petroleum Corp.*, 24 S.W.3d at 357; *Formosa Plastics*, 960 S.W.2d at 46–47; *Best*, 786 S.W.2d at 671–72; *Clary Corp.*, 949 S.W.2d at 463–64; *Bekins Moving & Storage Co.*, 947 S.W.2d at 577–78; *Kuehnhoefer*, 893 S.W.2d at 693; see also *Chang*, 2002 WL 24581, at *3; *Luera*, 2000 WL 1051895, at *3.

**56.** 962 S.W.2d 707, 711–12 (Tex.App.-Corpus Christi 1998), *rev'd in part on other grounds*, 1 S.W.3d 96 (Tex.1999); see also *Best*, 786 S.W.2d at 671–72 (holding evidence that defendant seller made false verbal assurances to purchaser of dealership that purchaser would be able to purchase additional inventory from manufacturer supported DTPA recovery under section 17.46(b)(12)); *Leal v. Furniture Barn, Inc.*, 571 S.W.2d 864, 865 (Tex.1978) (holding letter from furniture store stating that all funds previously deposited under layaway agreement would be forfeited if payment was not timely received constituted misrepresentation of rights of parties under agreement in violation of DTPA section 17.46(b)(12)); *Kuehnhoefer*, 893 S.W.2d at 693 (holding trial court erred in granting JNOV on DTPA claim based on misrepresentation by landlord that lessee could renew existing lease for five years).

to continue to perform the Agency–Company Agreement, and that their cause of action for misrepresentations properly sounded in tort under section 17.46(b)(12) of the DTPA, rising to more than a mere breach of contract claim involving interpretation of a disputed term.

■ Finally, Dallas Fire contends that the jury's failure to find that it breached the contract defeats TCSCA's and Young's DTPA claims under article 21.21 because the jury necessarily thereby accepted Dallas Fire's interpretation of the term "loss adjustment expense" as permitting it to include unallocated loss adjustment expenses in calculating the contingent profit commissions. In this regard, Dallas Fire relies upon the supreme court's holding in *DeWitt County*, that "a DTPA claim could not arise from actions permissible under a contract." [57] We disagree that the holding of the supreme court applies here. The supreme court rejected a claim by the landowner that the co-op's "unreasonable interpretation" of the contract, that the contract permitted it to cut down trees on the landowner's property, standing alone, constituted a misrepresentation under the DTPA.[58] The court held that claim was not cognizable because the contract expressly permitted the co-op to cut down trees on the property covered by the easement.[59]

TCSCA and Young did not claim that Dallas Fire merely asserted an "unreasonable interpretation" of the contract term

"loss adjustment expense." Rather, they alleged and offered proof of verbal statements made by Dallas Fire that the term as used in the agreement would not include expenses other than adjustment and legal expenses actually paid to third parties and tied directly to a bond claim. A similar claim was also made in *DeWitt County*, that the landlord made verbal assurances that it would *not* cut down the landowner's trees within the easement.[60] The supreme court did not address that claim, letting stand the holding of the court of appeals that the pleaded claim and evidence of the verbal assurances presented an issue for the jury as to misrepresentations actionable under section 17.46(b)(12) of the DTPA.[61]

■ Dallas Fire argues that it cannot be subjected to extra-contractual liability based upon a contract that the jury found it did not breach, citing cases in which the supreme court has held that, in most instances, an insured may not prevail on a bad faith insurance claim against an insurer for denying a claim not covered by the policy.[62] The cases Dallas Fire cites, however, did not involve independent claims for misrepresentations under the DTPA. Moreover, this case does not involve the common law cause of action for breach of good faith and fair dealing in wrongfully denying a claim that was alleged to be covered under an insurance policy, as in-

**57.** 1 S.W.3d at 103.

**58.** *Id.*

**59.** *Id.*

**60.** *Id.* at 104.

**61.** *Id.* at 104–05.

**62.** Dallas Fire cites *Liberty National Fire Insurance Co. v. Akin*, 927 S.W.2d 627, 629 (Tex.1996), and *Republic Insurance Co. v. Stoker*, 903 S.W.2d 338, 341 (Tex.1995), for

that proposition. *But see Southstar Corp. v. St. Paul Surplus Lines Ins. Co.*, 42 S.W.3d 187, 194 (Tex.App.-Corpus Christi 2001, no pet.) (distinguishing the insureds' negligence and DTPA claims, linked to the duty to defend, as constituting only breach of contract claims, from their claims based upon alleged prior misrepresentations by St. Paul of the terms of the policy, holding that the *misrepresentation claims could be brought independently of the claims for breach of the duty to defend* under the insurance agreement).

volved in the cases cited by Dallas Fire. An insurer ordinarily breaches its duty of good faith and fair dealing only by delaying or denying payment of a claim that is covered by the contract, after liability for the claim has become reasonably clear.[63]

TCSCA and Young acknowledge that they could not have recovered for both breach of contract and violation of the DTPA under article 21.21 for the same damages but would have been required to elect their remedy if the jury had found damages in their favor on both of the theories of recovery.[64] We also note that, by finding *no breach* of the agreement, the jury could reasonably have concluded that the formula set forth in the Agency Commission Schedule permitted Dallas Fire to calculate the commissions to include unallocated loss adjustment expense but that, by doing so, Dallas Fire acted contrary to the representations to TCSCA and Young that it would *not* do so but would include only expenses actually paid to third party adjusters and legal expenses. Therefore, we do not see how the jury's finding that Dallas Fire did not breach the contract necessarily precludes recovery on TCSCA's and Young's DTPA and article 21.21 claims for misrepresentation. Accordingly, we overrule subissues (a), (c), and (d) of Dallas Fire's first issue.

## C. Statute of Limitations for Article 21.21 Claim

■ In subissue (e) of its first issue, Dallas Fire argues that it was entitled to a JNOV because TCSCA's and Young's

claims under article 21.21 were barred by the two-year statute of limitations contained in section 16(d) of article 21.21.[65] Dallas Fire points out that any alleged unfair or deceptive act would have occurred in late 1996 or early 1997 and that the evidence at trial established that January 21, 1997, the date of the letter from Dallas Fire informing the agents that unallocated loss adjustment expense would be included in the calculation of their commissions, would have been the date they discovered the occurrence of any such alleged unfair act.

Milam acknowledged that, to his knowledge, the letter of January 21, 1997 was the first notice to TCSCA of Dallas Fire's position regarding the commissions. According to Dallas Fire, TCSCA and Young then had until January 21, 1999 to file an article 21.21 action. Because they did not amend their pleadings to allege that claim until March 24, 2000, more than two years later, Dallas Fire contends their claims are barred by limitations.

TCSCA and Young respond that Dallas Fire had the burden to request and obtain findings on limitations as a defense or to object to the absence of a jury question on that defense and by not doing so waived the defense of limitations. Dallas Fire maintains that the burden was on TCSCA and Young, as the parties seeking to avoid limitations, to prove and secure findings as to the date of discovery to avoid the defense.[66] We do not need to reach that

**63.** *See Universe Life Ins. Co. v. Giles,* 950 S.W.2d 48, 56 (Tex.1997); *Stoker,* 903 S.W.2d at 340.

**64.** *See Waite Hill Servs., Inc. v. World Class Metal Works, Inc.,* 959 S.W.2d 182, 184–85 (Tex.1998).

**65.** *See* TEX INS.CODE ANN. art. 21.21, § 16(d) (stating that an action under article 21.21 must be commenced within two years "after

the date on which the … unfair or deceptive act or practice occurred or within two years after the person bringing the action discovered or, in the exercise of reasonable diligence, should have discovered the occurrence of the unfair … act or practice.").

**66.** *See Woods v. William M. Mercer, Inc.,* 769 S.W.2d 515, 518 (Tex.1988) (holding initial burden is on party seeking to establish limita-

issue because we agree with TCSCA's and Young's further argument that their amended pleading sought an additional ground for liability arising out of the same transaction and related back to their original pleadings that were filed timely, based on the relation-back statute, section 16.068 of the Texas Civil Practice and Remedies Code.[67]

TCSCA filed its original petition for breach of contract on May 27, 1998, well within four years of the date of the alleged contract breach—whether in 1996 or 1997. The new cause of action under article 21.21, added by their amended pleadings in 2000, arose out of the same conduct and asserted the same damages. TCSCA argues that the amended pleadings adding the article 21.21 claim relate back to its original pleading. Young similarly argues that his original plea in intervention asserting breach of contract was filed timely within four years on August 28, 1999. Therefore, his amended pleadings adding the article 21.21 claim related back to the date of his original plea in intervention and were not subject to a plea of limitations. We agree.[68]

We hold that the original pleadings of both TCSCA and Young were filed within the period of limitations for actions for breach of contract, and the amended pleadings alleging violations of article 21.21 were based upon the same transaction and occurrence and thus related back for limitations purposes to the filing of the original pleadings and were not barred by limitations as a matter of law. We overrule subissue (e) of Dallas Fire's first issue.

## IV. DALLAS FIRE'S COUNTERCLAIMS

By its original counterclaim filed May 14, 1999, Dallas Fire alleged overpayment of commissions by virtue of "incorrect calculations," seeking recovery of amounts previously paid to TCSCA under the contract. Dallas Fire did not add its claims for breach of fiduciary duty, among other tort claims against TCSCA, until filing its Fourth Amended Original Counterclaim on November 11, 2000. Specifically, Dallas Fire alleged breaches of fiduciary duty by TCSCA by (1) failure to provide a $75,000 letter of credit; (2) failure to pay premiums collected for bid bonds; and (3) issu-

---

tion but party seeking to benefit from discovery rule has burden to plead, prove, and obtain favorable findings on issue of discovery as matter in avoidance).

**67.** Section 16.068 provides:

If a filed pleading relates to a cause of action, cross action, counterclaim, or defense that is not subject to a plea of limitations when the pleading is filed, a subsequent amendment or supplement to the pleading that changes the facts or grounds of liability or defense is not subject to a plea of limitation unless the amendment or supplement is wholly based on a new, distinct, or different transaction or occurrence.

TEX. CIV. PRAC. & REM.CODE ANN. § 16.068 (Vernon 1997).

**68.** *See, e.g., Duran v. Furr's Supermarkets, Inc.,* 921 S.W.2d 778, 791–92 (Tex.App.-El Paso 1996, writ denied); *Dorney v. Henderson*

*Clay Prods., Inc.,* 838 S.W.2d 314, 316 (Tex. App.-Texarkana 1992, writ denied) ("Section 16.068 allows a cause of action to be pleaded in an amended pleading after a limitations period has run if the claim relates to a cause of action filed before the limitations period ran."); *Long v. State Farm Fire & Cas. Co.,* 828 S.W.2d 125, 128–29 (Tex.App.-Houston [1st Dist.] 1992, writ denied) (holding claim for breach of good faith and fair dealing that insurer failed and refused to pay in accordance with policy contract based on same transaction or occurrence as original breach of contract claim and thus related back for limitations purposes), *disapproved of on other grounds by Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc.,* 962 S.W.2d 507, 518–19 (Tex.1998).

ance of bonds outside the State of Texas and after work on projects had commenced. Dallas Fire also sought a declaratory judgment as to the correct interpretation ·of the Agency–Company Agreement, as well as damages and "fee forfeiture" for the breach of fiduciary duty claim. In response to pleadings of limitations by TCSCA, Dallas Fire pleaded the discovery rule and application of the relation-back statute found in section 16.068 of the civil practice and remedies code.[69]

The jury found that TCSCA failed to comply with the Agency–Company Agreement but that its failure was excused. The jury also found that Dallas Fire discovered or should have discovered any breach of contract by TCSCA by January 27, 1994. Consequently, the jury did not reach or answer questions as to damages for breach of contract by TCSCA.

The jury determined that TCSCA failed to comply with its fiduciary duty, but it did not find that any such failure was a proximate cause of any damages to Dallas Fire. Also, the jury found "0" in response to the general damages question regarding Dallas Fire's causes of action. The jury further found that Dallas Fire discovered or should have discovered through the exercise of care and diligence TCSCA's failure to comply with its fiduciary duty by January 27, 1994.

In addition to its motion for JNOV, Dallas Fire filed other post-trial motions, including a motion for partial new trial raising factual insufficiency issues and a motion for "equitable relief" seeking forfeiture of all "contingent fees [sic]" previously paid to TCSCA. Dallas Fire complains about the jury's findings of the date of discovery and no damages on its breach of fiduciary duty claim and further

complains of the trial court's denial of its request for forfeiture of payments previously paid to TCSCA and denial of its attorney's fees under the Declaratory Judgment Act.

## A. Breach of Fiduciary Duty as to Bid Bond Premiums

■ Dallas Fire contends in its third issue that there is legally and factually insufficient evidence to support the jury's finding that it discovered or should have discovered TCSCA's breaches of fiduciary duty by January 27, 1994. First, Dallas Fire relies upon testimony of Milam that he was unaware that TCSCA was not remitting bid bond premiums until late 1996 or early 1997 when a bond audit was conducted.

Dallas Fire acknowledges that there is evidence in the record regarding the date of January 27, 1994, found by the jury to have been the date by which Dallas Fire discovered or should have discovered any breach of fiduciary duty as to the bid bonds. By a letter of that date, TCSCA employee Tanya Grant, wrote Dallas Fire and forwarded copies of all Dallas Fire bonds issued and charges, made for those bonds by TCSCA between August 1, 1993 and November 30, 1993, including bid bonds for which premiums were not remitted to Dallas Fire. Even Milam testified that he assumed that the company had information that TCSCA was issuing the bid bonds by January or February of 1994.

Fred Thetford also testified that TCSCA opened its records, including figures for bid bonds sold, for a regular audit by TDI in 1994. We cannot say that there is legally or factually insufficient evidence in the record to support the jury's finding that Dallas Fire discovered or should have discovered that TCSCA was charging bid

---

69. Tex. Civ. Prac. & Rem.Code Ann. § 16.068.

bond fees and not remitting Dallas Fire's portion to it by January 27, 1994.

Alternatively, Dallas Fire argues that, while it may have been made aware of bid bond charges in 1994, the breaches continued to occur after that date when TCSCA continued to collect bid bond fees until 1996 and that they continued even through trial by TCSCA's continued refusal to return commissions previously overpaid to it. However, as TCSCA points out, Dallas Fire never pleaded or obtained jury findings of a continuing tort or continuing injury as a basis to avoid limitations.[70]

Finally, Dallas Fire argues that the relation-back statute applies. Dallas Fire argues that its claims for breach of fiduciary duty, first pleaded in November of 2000, arose out of the same transaction as the overpayment to TCSCA in breach of the contract as alleged in its original counterclaim filed May 14, 1999. Dallas Fire argues that the original counterclaim was timely filed within the four-year statute of limitations for breach of contract claims because the company did not determine that an overpayment of commissions had occurred until January of 1997.[71] Dallas Fire therefore contends that its subse-

quently pleaded fiduciary duty claims relate back to the filing of the original counterclaim and are likewise timely filed.

We disagree with Dallas Fire's relation-back argument for the reason that the jury expressly found, in answer to a separate question, that Dallas Fire also discovered or should have discovered any *breach of contract* by TCSCA by January 27, 1994. Dallas Fire has not challenged the jury's finding in answer to that question. Based on that finding, Dallas Fire's breach of contract claim was already barred by limitations when its original counterclaim was filed, more than five and one-half years later, on May 14, 1999. Under those circumstances, the relation-back doctrine does not apply.[72]

## B. Projects outside State and Already in Progress

By its third issue, Dallas Fire also complains of legally and factually insufficient evidence to support the jury's finding that it discovered or should have discovered by January 27, 1994 any breach of fiduciary duty by TCSCA in writing performance bonds on construction projects outside the State of Texas or on projects already in progress. Dallas Fire relies on Milam's

---

70. *See Dickson Constr., Inc. v. Fid. & Dep. Co. of Maryland,* 960 S.W.2d 845, 850 (Tex.App.-Texarkana 1997, no pet.) (holding matter in avoidance of limitations must be affirmatively pleaded); *Arquette v. Hancock,* 656 S.W.2d 627, 629–30 (Tex.App.-San Antonio 1983, writ ref'd n.r.e.) (holding pleading alleging county constable wrongfully threatened and intimidated plaintiff into paying fine alleged a cause of action accruing when fine paid, not a continuing tort based on alleged continual failure to refund the money); *Bank of N. Am. v. Kruger,* 551 S.W.2d 63, 67 (Tex.Civ.App.-Houston [1st Dist.] 1977, writ ref'd n.r.e.) (holding action for conversion accrues when property actually taken, not continuing so as to toll limitations by failure to return); *Foreman v. Graham,* 363 S.W.2d 371, 372–73 (Tex.Civ.App.-Beaumont 1962, no writ) (holding action for debt accrues when payment is

due and is not extended by refusal to repay); *see also Mitchell Energy Corp. v. Bartlett,* 958 S.W.2d 430, 443 (Tex.App.-Fort Worth 1997, pet. denied) (noting plaintiffs obtained finding that injury to property was "ongoing and continuous" but holding theory not applicable to cause of action alleged for permanent injury to land).

71. Tex. Civ. Prac. & Rem.Code Ann. § 16.004 (Vernon 2002).

72. *See id.* § 16.068; *Cram Roofing Co. v. Parker,* No. 04-01-00723-CV, 131 S.W.3d 84, 89, 2003 WL 22955967, at *2 (Tex.App.-San Antonio Dec. 17, 2003, no pet.) (op. on reh'g en banc) (recognizing that for an amended pleading to relate back to an earlier pleading, "the original cause of action asserted in the first pleading must have been timely filed").

testimony that it was during the same time frame that he first learned that TCSCA issued surety bonds outside the State of Texas, in New Mexico, Kansas, and Colorado, and on projects already in progress.

TCSCA points us to no evidence contradicting Milam's testimony that he did not discover that TCSCA had written performance bonds on construction projects located outside the State of Texas or on projects already in progress until late 1996 or early 1997 at the time of the bond audit. However, any implicit jury finding that Dallas Fire discovered or should have discovered any such breach of fiduciary duty in those respects by January 27, 1994 is immaterial unless the jury's failure to find that any such breach was a proximate cause of damage to Dallas Fire, and the jury's further finding that Dallas Fire suffered "0" amount of damages as the result of any such conduct, are against the overwhelming weight and preponderance of the evidence.[73] In this court, Dallas Fire has not complained that the jury's failure to find that any breach of fiduciary duty by TCSCA was a proximate cause of any damage to Dallas Fire was against the overwhelming weight of the evidence. On this basis alone, we hold that the jury's finding of the date of discovery regarding the out-of-state bonds and bonds issued on projects in progress is immaterial.[74] We overrule Dallas Fire's third issue.

## C. Claimed Damages for Breach of Fiduciary Duty

■ In its fifth issue, Dallas Fire complains that the jury's finding in answering Question No. 28 of "0" damages for TCSCA's breach of fiduciary duty is against the overwhelming weight of the evidence. Dallas Fire points out that Milam testified he incurred damages of $27,000 for attorney George McCarthy to perform a bond audit, in the course of which the out-of-state bonds and bonds written on projects already in progress were discovered.[75] The other dollar amounts mentioned by Dallas Fire in its brief as evidence of damages are: (1) the contingent profit commissions of $69,890.33 previously paid, which it contends TCSCA failed to return; and (2) its percentage of the bid bond premiums claimed. Dallas Fire has not challenged the jury's failure to find that any breach of fiduciary duty was a *proximate cause* of damages to Dallas Fire, in response to Question No. 18.[76] The law is well-settled that a finding of no damages is immaterial in the absence of a

---

**73.** Dallas Fire had the burden of proof both as to proximate cause and as to the amount, if any, of damages that would compensate it for any breaches of fiduciary duty of TCSCA; therefore, Dallas Fire has the burden on appeal to establish that the jury's findings are so against the overwhelming weight and preponderance of the evidence as to be manifestly unjust. *See Gooch v. Am. Sling Co.*, 902 S.W.2d 181, 184 (Tex.App.-Fort Worth 1995, no writ).

**74.** *Wilson v. Tex. Parks & Wildlife Dep't*, 853 S.W.2d 825, 832 (Tex.App.-Austin 1993) (stating that unchallenged finding that appellant's own negligence was the proximate cause of their deaths supported the trial court's judgment and precluded reversal), *rev'd on other grounds*, 886 S.W.2d 259 (Tex.1994).

**75.** The jury was not asked to find damages for these bonds. Question No. 28 limited the elements of damages to (1) the amount charged for bid bonds and (2) overpayment of contingency fee commission. Dallas Fire does not challenge the manner of submitting the elements of damages. Thus, we only evaluate Dallas Fire's fifth issue with respect to the two elements of damages that were submitted to the jury.

**76.** *See McGalliard v. Kuhlmann*, 722 S.W.2d 694, 696 (Tex.1986) (stating that unchallenged findings of fact are binding unless the contrary is established as a matter of law or there is no evidence to support the finding).

finding of proximate cause.[77] Accordingly, we overrule Dallas Fire's fifth issue.

## D. Request for Equitable "Fee Forfeiture"

■ By its fourth issue, Dallas Fire contends that, regardless of the jury's findings on damages, the trial court abused its discretion by denying Dallas Fire's motion for equitable relief seeking forfeiture of all commissions previously paid to TCSCA and Young, based on the jury's finding of breach of fiduciary duty, as a matter of law. Dallas Fire argues that, when a fiduciary has benefitted or profited from a breach of fiduciary duty, the complainant is entitled to equitable relief in the form of disgorgement or fee forfeiture, without having to establish that the breach caused damage.

We disagree that Dallas Fire would have established a right to equitable relief as a matter of law. To the contrary, the supreme court has held that whether to order fee forfeiture and to what extent, are matters within the trial court's discretion.[78] Dallas Fire did not request that the trial court submit any of the questions necessary to apply the factors identified by the supreme court in order for a trial court to determine whether a "clear and serious violation of duty" has occurred, whether forfeiture is appropriate, and if so, whether all or only part of a fee should be forfeited, as set forth in *Burrow*,[79] upon which Dallas Fire relies.

Because Dallas Fire did not request or obtain jury findings on whether TCSCA and Young acted intentionally, with gross negligence, or recklessly, or on the value of the agents' services, as required by *Burrow*, we hold that the trial court acted within its discretion in denying the motion for equitable relief.[80] We overrule Dallas Fire's fourth issue.

## E. Attorney's Fees under the Declaratory Judgment Act

In its final issue, Dallas Fire contends the trial court abused its discretion in denying its request for attorney's fees under the Texas Declaratory Judgment Act because the jury found that TCSCA breached the Agency–Company Agreement but Dallas Fire did not. Specifically, Dallas Fire argues that, by its findings, the jury necessarily determined that Dallas Fire did not breach the contract by including "unallocated loss adjustment expense" in the formula used to calculate TCSCA's and Young's contingent profit commissions, and thereby determined that the contract should be interpreted in Dallas Fire's favor. Because both parties sought a declaratory judgment on that question of interpretation, Dallas Fire urges that it prevailed on that issue and that the trial court should have awarded it the attorney's fees expended by it in defending against all of TCSCA's and Young's claims and in prosecuting its own counterclaims

---

77. *Owens v. Rogers*, 446 S.W.2d 865, 866 (Tex.1969); *Jones v. Lurie*, 32 S.W.3d 737, 744 (Tex.App.-Houston [14th Dist.] 2000, no pet.) (recognizing "the well-established rule of law that a finding of zero damages is immaterial in the absence of liability findings"); *Wilson*, 853 S.W.2d at 832.

78. *Burrow v. Arce*, 997 S.W.2d 229, 241 (Tex. 1999).

79. *Id.* at 243 (rejecting a rigid approach to attorney fee forfeiture and listing factors to be considered by trial court, as set forth in RESTATEMENT (SECOND) OF TRUSTS, § 243, cmt. c).

80. *See id.* at 246 (stating "trial court must determine ... whether factual disputes exist that must be decided by a jury before the court can determine whether a clear and serious violation of duty has occurred, whether forfeiture is appropriate, and if so, whether all or only part of the attorney's fee should be forfeited").

pertaining to interpretation of the agreement.

 Under the Declaratory Judgment Act, attorney fee awards are entrusted to the trial court's sound discretion, "subject to the requirements that any fees awarded be reasonable and necessary, which are matters of fact, and to the additional requirements that fees be equitable and just, which are matters of law."[81] We review a trial court's ruling for an abuse of discretion.[82] Thus, we must determine whether the trial court acted arbitrarily, unreasonably, or without reference to any guiding rules or principles.[83] An abuse of discretion does not occur where the trial court bases its decisions on conflicting evidence.[84] Furthermore, an abuse of discretion does not occur as long as some evidence of substantive and probative character exists to support the trial court's decision.[85]

"Whether a party prevails in a declaratory judgment action is not a determining factor in awarding attorney's fees."[86] On this record, Dallas Fire has not shown that the trial court abused its discretion in denying its request for attorney's fees under the Texas Declaratory Judgment Act. Accordingly, we overrule Dallas Fire's sixth issue.

81. *Bocquet v. Herring,* 972 S.W.2d 19, 21 (Tex.1998); TEX. CIV. PRAC. & REM.CODE ANN. § 37.009 (Vernon 1997); *see also Knighton v. IBM Corp.,* 856 S.W.2d 206, 210 (Tex.App.-Houston [1st Dist.] 1993, writ denied) ("The award of attorney's fees is not limited to the plaintiff or the party affirmatively seeking declaratory relief.").

82. *Oake v. Collin County,* 692 S.W.2d 454, 455 (Tex.1985).

83. *See Garcia v. Martinez,* 988 S.W.2d 219, 222 (Tex.1999).

## V. CONCLUSION

Having overruled each of Dallas Fire's six issues, we affirm the judgment of the trial court.

84. *Davis v. Huey,* 571 S.W.2d 859, 862 (Tex. 1978); *see also Goode v. Shoukfeh,* 943 S.W.2d 441, 446 (Tex.1997).

85. *Holley v. Holley,* 864 S.W.2d 703, 706 (Tex. App.-Houston [1st Dist.] 1993, writ denied).

86. *Black v. City of Killeen,* 78 S.W.3d 686, 701 (Tex.App.-Austin 2002, pet. denied) (citing *Comm'rs Court v. Agan,* 940 S.W.2d 77, 82 (Tex.1997) and *Barshop v. Medina County Underground Water Conservation Dist.,* 925 S.W.2d 618, 637 (Tex.1996)).