**AFFIRM in Part, REVERSE in Part, and REMAND; Opinion Filed August 23, 2019.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-17-01318-CV

### CEXCHANGE, LLC, Appellant
### V.
### TOP WIRELESS WHOLESALER, Appellee

**On Appeal from the 14th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. DC-16-02705**

# MEMORANDUM OPINION

Before Justices Bridges and Richter[1]
Opinion by Justice Bridges

This appeal arises from an "as is" sale of used merchandise. The buyer, appellee Top

Wireless Wholesaler (Top), claims that the seller, appellant CExchange, LLC, misrepresented the

grading and quality of the merchandise for sale. CExchange appeals a jury verdict awarding Top

damages. It raises four issues, including that the "as is" provision in the parties' contract barred

Top's claims as a matter of law. We affirm in part and reverse and remand in part.

## BACKGROUND

CExchange and Top are both electronics resellers. The events that gave rise to this suit

occurred in December 2015 and in January 2016. On December 15, CExchange purchased 9,119

used "Beats" headphones and speakers from Best Buy for $276,474.18. Before the purchase, Best

---

[1] The Hon. Martin Richter, Justice, Court of Appeals, Fifth District of Texas at Dallas, Retired, sitting by assignment. Justice Boatright is no longer at the Court and did not participate in the decision.

Buy forwarded a spreadsheet to CExchange that described the grading of the units for sale. The spreadsheet reflected that Best Buy had graded 89% of the merchandise as "Grade D," meaning that the "product was found to have defects"—including "physical or functional issues"—and may be missing "accessories" or "retail packaging."

On December 16, CExchange's Director of Operations, Oscar Trevino, sent an e-mail to a Top employee, Israel Biller, inquiring whether Top was interested in purchasing Beats headphones. Trevino's e-mail did not specify the source of the headphones, but around the same time Top was separately seeking to convince Best Buy to give Top the opportunity to make an offer to purchase from Best Buy a group of salvage Beats products. Accordingly, Top wished to confirm with CExchange that the lot it was selling was different than the salvage lot that Top had discussed with Best Buy. Top did not ask CExchange whether its lot had come from Best Buy, but Biller's response to Trevino's e-mail did ask about the condition of the merchandise for sale. Trevino replied that "[t]hese are all ungraded customer returns."[2] He noted that, based on CExchange's "past experience with this[,] the majority of the items are in working condition" and "will be in the original retail packaging." However, his e-mail also warned of the "risk that not 100% of them are in working condition." Trevino confirmed in a telephone call with Top that CExchange had purchased the items as ungraded and did not yet have them in its possession.

Top offered $408,000 to purchase the entire lot of merchandise, and CExchange accepted the offer on December 18. That same day, CExchange forwarded an invoice for the merchandise. The invoice noted that the sale was "AS-IS" and that "No Warranty" had been made. The sale was contingent on Top's satisfaction with the merchandise following an inspection.

---

[2] "Grading" refers to the process of sorting, inspecting, and grouping returned merchandise into categories such as "working," "non-working," or "defective." Biller testified that Top preferred merchandise that was either Grade A, Grade B, or ungraded.

Thereafter, the parties made arrangements for Top's owner, Amman Lifshiz, to travel from New Jersey to Texas to conduct the inspection at CExchange's warehouse. The approaching Christmas holiday limited the number of available flights. Top proposed Tuesday, December 22, as the inspection date. CExchange responded that the merchandise totaled forty-eight pallets, some of which would not arrive until December 23. It noted that it "still need[ed] to go through the order to insure accuracy." Accordingly, CExchange suggested that Lifshiz begin his inspection on the afternoon of the 22nd and that he stay over the following day to complete the inspection. However, Lifshiz's schedule precluded him from staying until the 23rd. He instead elected to proceed with a single-day inspection on the 22nd of the merchandise available at that time.

When Lifshiz arrived at CExchange's warehouse, CExchange had received two pallets from Best Buy. Lifshiz inspected the pallets for approximately ten to fifteen minutes, and he immediately recognized that they were from Best Buy. The pallets contained between 400 and 500 units, the majority of which were in their original retail packaging. Top had dealt with CExchange four or five times in the past, and Lifshiz testified that he trusted CExchange. Based on his inspection of the two pallets, Lifshiz decided to move forward with the purchase. The following day, on December 23, Top wired the $408,000 payment.

CExchange received the remaining pallets from Best Buy on December 23 and on December 28. Unlike the first shipment, the units in the subsequent shipments were packaged in plastic bags. Trevino expressed concern within CExchange that the new shipments did not match the first two pallets that Lifshiz had inspected. CExchange did not notify Top of this new information.

On January 11, 2016, Top received the 9,119 units it had purchased. It discovered the vast majority of them were in "salvage condition," i.e., they looked "physically defective," and they were in plastic bags rather than in their original packaging. Top tested a sampling of the units and

confirmed that 90% "were either physically or technically damaged." It sought to return the merchandise, but CExchange refused.

Top sued CExchange and asserted five causes of action: breach of contract, breach of express warranty, fraudulent inducement, negligent misrepresentation, and deceptive trade practices (DTPA). The core of Top's complaint is that CExchange knew all along, but failed to disclose to Top, that Best Buy had graded the merchandise as Grade D. CExchange responds that its representation regarding "all ungraded customer returns" was truthful because, in contrast to its previous sales to Top, CExchange had not graded these returned goods.

CExchange generally denied Top's allegations and asserted several affirmative defenses, including the doctrines of disclaimer, waiver, and estoppel, as well as Top's own negligence. Thereafter, the parties filed cross-motions for summary judgment. Following the court's rulings on these motions, Top's claims for breach of contract, breach of warranty, and deceptive trade practices remained.

The case was tried before a jury, which returned a verdict on June 28, 2017. Among other questions, the charge asked whether CExchange agreed to sell products that were "all ungraded customer returns," or whether they were instead sold "as is." The jury answered "[a]ll ungraded customer returns." It awarded Top $171,500, which is less than half of the $346,000 sum it had requested. CExchange filed a motion for judgment notwithstanding the verdict, which the court denied. On August 17, 2017, the court rendered judgment for Top in the amount of $171,500 in actual damages, in accordance with the jury's verdict. The judgment also awarded Top $182,854.75 in attorney's fees through trial, additional attorney's fees conditioned on Top's success on appeal, pre- and post-judgment interest, and taxable costs. CExchange filed a motion for new trial, which the court denied. This appeal followed.

–4–

# ANALYSIS

## I.      "As Is" and "No Warranty" Provisions

In its first issue, CExchange contends the "as is" and "no warranty" provisions in the parties' contract barred all of Top's claims as a matter of law. A valid "as is" agreement prevents a buyer from holding a seller liable if the item sold turns out to be worth less than the price paid. *Prudential Ins. Co. of Am. v. Jefferson Assocs., Ltd.*, 896 S.W.2d 156, 161 (Tex. 1995). This is so because "it is impossible for the buyer's injury on account of this disparity to have been caused by the seller." *Id.* Instead, the sole cause of the injury is the buyer's agreement to take the full risk of determining the value of the purchase.[3] *Id.* Applying the foregoing principle, the Supreme Court in *Prudential* held that the contract's "as is" clause in that case conclusively showed that nothing the defendant did caused the plaintiff's damages. *Id.* at 164; *see also Gym-N-I Playgrounds, Inc. v. Snider*, 220 S.W.3d 905, 908, 914 (Tex. 2007) (holding that "as is" clause in commercial lease negated causation element of several of tenant's claims against landlord).

CExchange relies on *CAS, Ltd v. TM Aviation Partners, LP*, in which this Court affirmed the trial court's judgment for a defendant seller based on an "as is" clause in the bill of sale. No. 05-15-00779-CV, 2016 WL 4151455, at *1 (Tex. App.—Dallas Aug. 4, 2016, no pet.) (mem. op.). In that case, the seller owned used "aviation floats"—*i.e.*, "'pontoons . . . designed to go on aircraft'"—that he had previously purchased based solely on his review of photographs of the floats. *Id.* at *1 & 3. The seller had not taken possession of the floats after purchasing them from their original owner, nor did he personally see the floats in the years that he owned them. *Id.* at 1. Nevertheless, the seller represented the floats to be "'like new'" and with only "twenty hours of total float time on the water." *Id.* at *1. However, in reality the floats were "in very poor condition,"

---

[3] As with an "as is" provision, a "no warranties" provision obligates the buyer to rely entirely upon his own examination of the property. *Id.* at 164. In this opinion, the term "as is" refers to both the "as is" and "no warranty" provisions in the subject invoice.

had "lots of corrosion," were "badly stored," and had "more than twenty hours of total time on them." *Id*. The buyer agreed to purchase the floats "as is" without conducting any inspection other than reviewing the same photos that the seller had examined before buying the floats four years earlier. *Id.* at *1–2.

Under these circumstances, we held that the "as is" clause precluded the buyer from proving that the seller's conduct caused the buyer's harm. *Id.* at *4. We noted that the buyer himself had drafted the bill of sale, which included the "as is" provision, and both parties were "sophisticated businessmen with years of experience in buying and selling within the aviation industry." *Id.* at *3. Moreover, the "as is" clause was "not boilerplate language hidden within a lengthy document, but rather" was "set forth in the few short paragraphs comprising the one page document." *Id.* In addition, the seller made it clear he had never personally seen the floats, and he encouraged the buyer to inspect them himself. *Id*. Nor did the record indicate the seller had any superior knowledge of aircraft floats over the buyer. *Id.* at *5. We were not persuaded by the buyer's contention the seller had fraudulently concealed that the photos of the floats were over four years old. *Id.* We noted the seller disclosed he had never inspected the floats and that they were over thirty-years old. *Id.* In addition, the seller did not impair the buyer's ability to inspect the floats prior to sale. *Id.*

## A.      Scope of Agreement

We begin by considering Question 1 of the court's charge, which asked the jury to choose whether CExchange agreed to sell goods to Top that were "'all ungraded customer returns,'" or whether the goods were instead sold "'as is.'" The jury answered, "[a]ll ungraded customer returns" Question 1 was derived from the parties' competing proposals regarding the submission of Top's breach of contract claim. CExchange's proposed charge asked whether the parties agreed that Top "was buying the goods at issue 'as is.'" In contrast, Top's proposed charge asked whether

CExchange "failed to comply with its agreement to sell . . . 'all ungraded customer returns,'" and it defined such returns as "neither graded by CExchange nor by any other third party."

The parties disagree regarding the impact of Question 1. CExchange urges that this question related to the enforceability of the "as is" clause, which in its view is a question of law that should not have been submitted to the jury. It argues the jury's finding in response to this question must therefore be disregarded. *See Se. Pipe Line Co. v. Tichacek*, 997 S.W.2d 166, 172 (Tex. 1999) (noting that "[a] question is immaterial when it should not have been submitted" or "it calls for a finding beyond the province of the jury, such as a question of law"). It also contends that the record establishes as a matter of law that Top purchased the subject products "as is" and with "no warranty."

Top does not dispute that the enforceability of an "as is" clause is a question of law, but it urges that it was CExchange who submitted the "as is" language that the court incorporated into Question 1. It also contends the jury correctly determined in response to Question 1 that the "as is" clause was not an operative part of the contract.

Question 1 did not ask whether the "as is" clause was enforceable. On its face, this question instead asked the jury to determine the scope of the agreement—either "all ungraded customer returns" or "as is"—which is a question of fact. *See Preston Farm & Ranch Supply, Inc. v. Bio-Zyme Enters.*, 625 S.W.2d 295, 298 (Tex. 1981) ("The question of whether an agreement was reached by the parties is generally a question of fact where the existence of the agreement is disputed."). Under the circumstances here, we agree with Top that the jury's finding of "all ungraded customer returns" amounts to a determination that the "as is" clause was not an operative part of the subject agreement.[4]

---

[4] We address below CExchange's complaint that the charge did not ask the jury to determine whether CExchange breached the contract.

## B.      Enforceability of "As Is" Clause

Even if the "as is" clause were part of the contract, we conclude that in this case the jury's findings and the supporting evidence establish that the clause was unenforceable. Relevant to this point, the *Prudential* court noted that an "as is" clause will not preclude a buyer's claim in every circumstance. 896 S.W.2d at 162. Specifically, an "as is" clause is not binding if the buyer was induced to enter the transaction by the seller's fraudulent representation or concealment of information. *Id*. A buyer is also not bound "if he is entitled to inspect the condition of what is being sold but is impaired by the seller's conduct." *Id.* Other aspects of a transaction may also make an "as is" agreement unenforceable. *Id.* In conducting such an assessment, we must consider the nature of the transaction and the totality of the circumstances. *Id.* An "as is" contract "freely negotiated by similarly sophisticated parties . . . in an arm's length transaction has a different effect than a provision in a standard form contract which cannot be negotiated and cannot serve as the basis of the parties' bargain." *Id.*; *see also Bishop v. Creditplex Auto Sales L.L.C.*, No. 05-15-00395-CV, 2016 WL 3453633, at *3 (Tex. App.—Dallas June 23, 2016, no pet.) (mem. op.) (noting that an "as-is clause may not be controlling if it appears in a standard form contract that cannot be negotiated nor serve as the basis of the parties' bargain, particularly if the parties are not equally sophisticated."). In this opinion, we will refer collectively to the foregoing circumstances in which an "as is" clause does not apply as "*Prudential* exceptions."

The Texas Supreme Court has noted that a court should normally determine the "preliminary question" of whether an "as is" clause is enforceable before determining whether such a clause waived a plaintiff's claims. *Gym-N-I Playgrounds*, 220 S.W.3d at 912. However, the question of enforceability may rest on the jury's resolution of disputed fact issues. *Cf. Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 357 (Tex. 2011) ("We review legal questions that rest on a factual basis de novo, while affording deference to the trial

court's findings of fact."). For example, in *Bishop*, we held that the evidence raised fact issues regarding the enforceability of an "as is" clause that precluded the rendition of a directed verdict in favor of the defendant seller. 2016 WL 3453633, at *4–7. We also acknowledged that our sister courts have construed the *Prudential* exception for fraudulent inducement "to mean that the buyer resisting the as-is clause must prove the elements of common law fraud regarding the condition of the property being sold in order to overcome the clause."[5] *Id.* at *6; *cf. GJP, Inc. v. Ghosh*, 251 S.W.3d 854, 886–87 (Tex. App.—Austin 2008, no pet.) (holding that a seller's assertion of an "as is" clause is an "inferential rebuttal"—"[a] question that presents a contrary or inconsistent theory from the claim relied upon for recovery"—that should be submitted as an instruction to a liability question rather than as a separate question. (citation and internal quotation marks omitted)). In determining whether any of the *Prudential* exceptions apply in this case, we will begin by examining the jury's findings.

The findings that CExchange violated the DTPA establish that the *Prudential* exception for fraudulent inducement applies here. "[T]he DTPA did not codify the common law, and . . . one of its primary purposes is to provide consumers a cause of action for deceptive trade practices without the burden of proof and numerous defenses encountered in a common law fraud or breach of warranty suit." *Cruz v. Andrews Restoration, Inc.*, 364 S.W.3d 817, 825 (Tex. 2012) (citation and internal quotation marks omitted). While DTPA and fraud claims are not identical, the jury's DTPA findings in this case established almost all of the elements of a common law fraud claim. *See Bishop,* 2016 WL 3453633, at *6 (reciting elements of common law fraud claim). Specifically, the jury responded "yes" to Question 6, which asked whether CExchange had "engaged in any false, misleading, or deceptive act or practice that Top . . . relied on to [its] detriment and that was a producing cause of damages." Consistent with Business and Commerce Code section 17.46, the

---

[5] We assumed without deciding that these courts are correct. *Id.*

–9–

charge defined "'[f]alse, misleading, or deceptive act or practice" as (i) representing that the units sold had characteristics that they did not have, or (ii) that the units would be of a particular grade, if they were another, or (iii) failing to disclose information about the units "that was known at the time of the transaction with the intention to induce Top . . . into a transaction it otherwise would not have entered into if the information had been disclosed." *Id.* § 17.46(b)(5), (b)(7), (b)(24). Although we cannot tell from the jury's answer which of these specific circumstances, if not all of them, it found to be true, the answer at a minimum shows that the jury determined CExchange made material misrepresentations or omissions on which Top relied and that such misrepresentations or omissions were a producing cause of Top's damages. In response to Question 7, the jury also found that CExchange "knowingly engaged in any false, misleading, or deceptive act or practice that Top . . . relied on to [its] detriment and that was a producing cause" of its damages. We conclude that these findings are essentially a determination by the jury that CExchange fraudulently induced Top to enter the sales contract, thereby rendering the "as is" clause in the contract unenforceable. *Prudential,* 896 S.W.2d at 162.

CExchange urges that it had no duty to disclose the Best Buy spreadsheet, citing the Texas Supreme Court's refusal to adopt a general duty to disclose facts in a commercial setting. *Bradford v. Vento*, 48 S.W.3d 749, 755–56 (Tex. 2001). However, a person who "voluntarily discloses information . . . has a duty to disclose the whole truth rather than making partial disclosures that convey a false impression." *Flood v. Katz*, 294 S.W.3d 756,763 (Tex. App.—Dallas 2009, pet denied). In this case, CExchange's representation that the subject goods were "all ungraded customer returns" suggested that the returns had not been graded by any prior owner in the supply chain. CExchange also stated that the majority of the items were "in working condition" and in their "original retail packaging." Yet the record shows that CExchange knew at the time that Best Buy had graded 89% of the items as having "physical or functional issues," missing accessories,

–10–

and missing retail packaging. This evidence supports the jury's findings and establishes that CExchange had a duty to notify Top of the Best Buy spreadsheet.

CExchange also contends that its statements to Top regarding the quality of the goods to be delivered were predictions of the future—in its view, opinions—which cannot form a basis for fraud. *See Country Village Homes, Inc. v. Patterson*, 236 S.W.3d 413, 435 (Tex. App.—Houston [1st Dist.] 2007, pet. granted, judgm't vacated w.r.m.) ("Generally, a prediction of the future will not be held to be fraudulent."). As explained below, we conclude that CExchange's representations regarding the subject goods were statements of fact, not opinions. Moreover, even if the representations were predictions of the future, the evidence that CExchange knew they were false supports the jury's findings. *See id.* ("[A] statement about the future that was made with present knowledge that the statement must be false can support a finding of fraud.").

For each of the foregoing reasons, we conclude that the "as is" clause did not bar Top's claims.[6] In light of this holding, we need not consider Top's other arguments against the applicability of the clause. We overrule CExchange's first issue.

## II.     Express Warranty and DTPA Claims

CExchange's second issue raises several additional grounds that in its view require the reversal of Top's express warranty and DTPA claims and the rendition of judgment for CExchange with respect to these claims.

### A.     Jury Findings Regarding Disclaimer

In response to Question 3, the jury found by a preponderance of the evidence that "CExchange breached a warranty by failing to deliver a majority of the headphones and speakers in working condition and in original retail packaging." However, the jury found in response to

---

[6] CExchange also asserts that no fraud occurred here because Top suspected that the goods might be inferior and therefore decided to inspect them before making its purchase decision. We will address this argument in the context of Top's third issue which, among other assertions of error, urges that the court's charge should have included proportionate responsibility questions.

Question 4 that "the express warranties were disclaimed." This question defined "disclaimer" as "an oral or written statement intended to limit a seller's liability for defects in the goods sold." CExchange contends that the jury's finding that express warranties were disclaimed defeats Top's warranty claim. Top responds, among other arguments, that this finding is immaterial. It also contends that Question 4 should be analyzed under a fatal conflict analysis and that CExchange waived any error regarding conflicting jury answers.

Our resolution of CExchange's first issue bears on our analysis here. As noted previously, the jury's DTPA findings in response to Questions 6 and 7 were essentially a determination that CExchange fraudulently induced Top to enter the sales contract. Such findings rendered the "as is" provision—the only disclaimer at issue—unenforceable. *Prudential,* 896 S.W.2d at 162–64. We therefore conclude that the jury's DTPA findings rendered its disclaimer finding immaterial. *See USAA Tex. Lloyds Co. v. Menchaca*, 545 S.W.3d 479, 506 (Tex. 2018) ("A jury answer is immaterial when the question . . . was properly submitted but has been rendered immaterial by other findings." (citation and internal quotation marks omitted)).

### B. Evidentiary Sufficiency

CExchange next contests the legal and factual sufficiency of the evidence to support the jury's findings regarding Top's express warranty and DTPA claims. In reviewing a legal sufficiency challenge, we must credit favorable evidence that supports the verdict, if reasonable jurors could, and disregard contrary evidence unless reasonable jurors could not. *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). Anything more than a scintilla of evidence is legally sufficient to support a jury's finding. *Cont'l Coffee Prods. Co. v. Cazarez*, 937 S.W.2d 444, 450 (Tex. 1996). To be more than a scintilla, the evidence must "rise[ ] to a level that would enable reasonable and fair-minded people to differ in their conclusions." *Gharda USA, Inc. v. Control Sols., Inc.*, 464 S.W.3d 338, 347 (Tex. 2015) (citation and internal quotation omitted). In contrast

to legal sufficiency review, a challenge to the factual sufficiency of the evidence requires us to "consider and weigh all the evidence," and to "set aside the verdict only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust." *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986) (per curiam).

### 1. Express Warranty Claim

CExchange contends that the representations at issue were not warranties. It urges that these statements "instead conveyed a term that identified what was being sold, with a qualification since CExchange had not even seen the products" when the statements were made. "Generally, a warranty describes the character, quality, or title of the thing being sold." *Staton Holdings, Inc. v. Tatum, L.L.C.*, No. 05–12–01408–CV, 2014 WL 2583668, at \*2 (Tex. App.—Dallas June 10, 2014, pet. denied) (mem. op.). An express warranty includes "[a]ny affirmation of fact or promise made by the seller to the buyer which relates to the goods," or any description of such goods, which is made "part of the basis of the bargain." TEX. BUS. & COM. CODE ANN. § 2.313(a)(1)–(2). CExchange's representations that a "majority" of the subject items were "in working condition" and in their "original retail packaging" were statements of fact that described the character and quality of the items. Moreover, these statements arose out of the parties' agreed terms and resulted from a negotiated exchange. *Staton Holdings*, 2014 WL 2583668, at \*2. While CExchange noted the risk that less than 100% of the items were in working condition, we conclude that the foregoing representations were on their face express warranties.[7] We also conclude that the evidence supports the jury's finding that CExchange breached its warranties.

---

[7] We need not consider CExchange's alternative contention that the evidence is insufficient to show a warranty by sample under Business and Commerce Code section 2.313(a)(3).

## 2. *DTPA Claim*

Question 6 of the charge contained three alternative definitions of the phrase "[f]alse, misleading, or deceptive act or practice." Each of these definitions tracks one of the laundry-list provisions contained in section 17.46(b) of the DTPA. *Id.* § 17.46(b)(5), (b)(7), and (b)(24). CExchange challenges the sufficiency of the evidence to support (i) the jury's finding that CExchange violated any of the foregoing provisions, or (ii) the jury's findings of reliance and causation. We disagree with CExchange. As noted previously, the record contains evidence that CExchange made misrepresentations of fact that it knew were untrue given the Best Buy spreadsheet in its possession at the time the representations were made. There is also evidence that Top relied on CExchange's representations to its detriment. For example, Top's decision to purchase the merchandise was based on the representation that it was ungraded. We conclude that the foregoing evidence supports the jury's DTPA findings.

## C.    **Recasting of Contract Claim**

CExchange also urges that Top's breach of express warranty and DTPA claims were nothing more than a breach of contract claim. It similarly contends that the warranty and DTPA claims are barred by the economic loss rule, which "generally precludes recovery in tort for economic losses resulting from a party's failure to perform under a contract when the harm consists only of the economic loss of a contractual expectancy." *Chapman Custom Homes, Inc. v. Dallas Plumbing Co.*, 445 S.W.3d 716, 718 (Tex. 2014) (per curiam).

We disagree that Top's express warranty and breach of contract claims are one and the same. An express warranty claim "'involve[s] something more than a mere promise to perform under the contract.'" *Lopez v. Metro Lumber Indus., Inc.*, No. 05-13-01048-CV, 2014 WL 2807973, at *1 (Tex. App.—Dallas June 18, 2014, no pet.) (mem. op.) (quoting *Staton Holdings*, 2014 WL 2583668, at *2). In this case, Top's warranty claim is based on CExchange's delivery of

nonconforming goods, the majority of which were not in "working condition" or in their "original retail packaging." Such delivery gave rise to a breach of warranty claim, *Ellis v. Precision Engine Rebuilders, Inc.*, 68 S.W.3d 894, 896–97 (Tex. App.—San Antonio 2002, no pet.), as distinct from a breach of contract claim, *Med. City Dallas, Ltd. v. Carlisle Corp.*, 251 S.W.3d 55, 60 (Tex. 2008). However, "breach of an express warranty is founded on contract," and the recognition of this principle "comports with a party's expectations under the economic loss rule." *Id.* at 61–62. Even assuming that the economic loss rule limits Top's available damages with respect to its breach of warranty claim, CExchange does not contend that the damages awarded to Top were in excess of such limits.

Turning to Top's DTPA claim, "a mere breach of contract, without more, does not constitute a false, misleading or deceptive act' in violation of the DTPA." *Crawford v. Ace Sign, Inc.*, 917 S.W.2d 12, 14 (Tex. 1996) (per curiam) (citation and internal quotation marks omitted); *see also Sw. Bell Tel. Co. v. DeLanney*, 809 S.W.2d 493, 494 (Tex. 1991) ("[I]f the defendant's conduct . . . would give rise to liability only because it breaches the parties' agreement, the plaintiff's claim ordinarily sounds only in contract."). Applying this principle, we held in *Wright v. CAE SimuFlite, Inc.* that a plaintiff's allegation that he received a different service than what he had been promised could only be characterized as a breach of contract claim. No. 05-07-00759-CV, 2008 WL 2841165, at *2 (Tex. App.—Dallas July 24, 2008, no pet.) (mem. op.); *see also KLZ Diamond Tools, Inc. v. TKG Gen. Agency, Inc.*, No. 05-14-00458-CV, 2016 WL 3947412, at *8–9 (Tex. App.—Dallas July 18, 2016, no pet.) (mem. op.) (affirming no-evidence summary judgment rendered against plaintiff's DTPA claims of misrepresentations that were rooted in its contractual relationship with defendants). In contrast, the Texas Supreme Court concluded that a seller's misrepresentation that the buyer would receive a premium model of vehicle when in fact she was going to receive a base model violated the DTPA notwithstanding that the seller's failure

–15–

to comply with the representation would not alone violate the statute. *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 305 & n.15 (Tex. 2006) (citing T~EX~. B~US~. & C~OM~. C~ODE~ A~NN~. § 17.46(b)(7), (b)(24)). In this case, Top's DTPA claim is not based on CExchange's failure to perform duties imposed by the contract, but instead on its breach of an independent duty imposed by law not to make knowing misrepresentations to induce Top to enter the contract. *Dallas Fire Ins. Co. v. Tex. Contractors Sur. & Cas. Agency*, 128 S.W.3d 279, 293–94 (Tex. App.—Fort Worth 2004), *rev'd on other grounds*, 159 S.W.3d 895 (Tex. 2004) (per curiam) (citing *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 46–47 (Tex. 1998)). Moreover, the economic loss rule does not bar Top's DTPA claims. *Id.*; *see also Formosa Plastics*, 960 S.W.2d at 47 ("[T]ort damages are recoverable for a fraudulent inducement claim irrespective of whether the fraudulent representations are later subsumed in a contract or whether the plaintiff only suffers an economic loss related to the subject matter of the contract.").

For each of the foregoing reasons, we overrule CExchange's second issue.

## III.    Jury Charge

CExchange's third issue argues that the court's charge was erroneous in several respects. We review a trial court's jury charge rulings for an abuse of discretion, *Southwestern Energy Production Co. v. Berry–Helfand*, 491 S.W.3d 699, 727–28 (Tex. 2016), though whether a definition in the charge misstates the law is a legal question that we review de novo, *Seger v. Yorkshire Insurance Co., Ltd.*, 503 S.W.3d 388, 408 (Tex. 2016); *see also Hamid v. Lexus*, 369 S.W.3d 291, 295 (Tex. App.—Houston [1st Dist.] 2011, no pet.) ("Whether the charge submits the controlling issue in the case, in terms of theories of recovery or defense, is a question of law which is reviewed de novo.").

## A.       Breach of Contract

As described previously, Question 1 of the charge asked whether CExchange "[a]greed to sell goods to Top . . . that were either 'all ungraded customer returns' or 'as is.'" CExchange faults the court for not also submitting a question as to whether CExchange breached the contract. It urges the jury's damages award cannot stand absent a finding of breach. Top responds that (i) CExchange invited any alleged error regarding the foregoing question, (ii) it waived its objection by failing to raise it during the charge conference, and (iii) there was conclusive evidence that CExchange did not sell Top "all ungraded customer returns."

"A breach-of-contract claim can involve any one or more of numerous discrete issues, but the jury need only be asked and instructed about those the parties actually dispute, and on which the pleadings and evidence actually raise an issue." *Menchaca*, 545 S.W.3d at 501 (citation and internal quotation marks omitted). In this case, it is undisputed that CExchange represented "all" of the items for sale to be "ungraded customer returns." While CExchange did not itself grade the returns, it is undisputed that Best Buy had graded a majority of them as Grade D. Based on this evidence, the court observed during the trial, "I don't think that whether this product was graded or ungraded is going to be a question the jury gets." We agree because the foregoing evidence conclusively established that CExchange breached the contract by delivering items a majority of which were not ungraded. Accordingly, the court did not err when it decided not to include a breach of contract question in the charge.

## B.       Estoppel

The charge instructed the jury, if it found that CExchange agreed to sell goods that were "all ungraded customer returns," to proceed to Question 2, which inquired whether CExchange's "failure to comply was excused." The jury answered "no." CExchange proposed an instruction to this question that the "[f]ailure to comply is excused if the other party is estopped from enforcing

–17–

the contract" and that estoppel means that "a party to a contract will not be permitted to take a position inconsistent with the contract to the prejudice of another." The court refused this request. Its charge instead instructed that "[f]ailure to comply is excused if compliance is waived by the other party" and that "[w]aiver is an intentional surrender of a known right or intentional conduct inconsistent with claiming the right."

CExchange urges that Question 2 should have included its proposed estoppel instruction. It relies upon cases that address the defense of quasi-estoppel. Specifically, "[q]uasi-estoppel precludes a party from asserting, to another's disadvantage, a right inconsistent with a position previously taken." *Lopez v. Munoz, Hockema & Reed, L.L.P.*, 22 S.W.3d 857, 864 (Tex. 2000). Moreover, "[e]stoppel by contract is a form of 'quasi estoppel' based on the idea that a party to a contract will not be permitted to take a position inconsistent with its provisions, to the prejudice of another." *Johnson v. Structured Asset Servs., LLC*, 148 S.W.3d 711, 721–22 (Tex. App.—Dallas 2004, no pet.).

To raise the foregoing complaint in this appeal, CExchange was required to submit a proposed instruction with "substantially correct wording." TEX. R. APP. P. 278. Such wording must, in substance and in the main, be correct, and it may not be affirmatively incorrect. *Barnett v. Coppell N. Tex. Court, Ltd.*, 123 S.W.3d 804, 824 (Tex. App.—Dallas 2003, pet. denied). Top contends that CExchange's proposed instruction was not substantially correct because it omitted one of the required elements of quasi-estoppel—that "it would be *unconscionable* to allow a person to maintain a position inconsistent with one to which he acquiesced, or from which he accepted a benefit." *Lopez*, 22 S.W.3d at 864 (emphasis added); *see Deutsche Bank Nat'l Trust Co. v. Stockdick Land Co.*, 367 S.W.3d 308, 318–19 n. 17 (Tex. App.—Houston [14th Dist.] 2012, pet. denied) (noting that there are two elements of quasi-estoppel: "conduct that is inconsistent and

unconscionable"). We agree, and we therefore conclude that the court did not abuse its discretion by refusing to submit this deficient instruction.

Top also urges that the evidence was legally insufficient to justify the submission of an estoppel instruction. A party is entitled to a jury question, instruction, or definition "if the pleadings and evidence raise an issue." *Union Pac. R.R. Co. v. Williams*, 85 S.W.3d 162, 166 (Tex. 2002) (citing TEX. R. CIV. P. 278). We must examine the record and determine if the pleadings and legally sufficient evidence support an estoppel instruction. *GJP*, 251 S.W.3d at 885–86. CExchange notes that Top elected to forgo its inspection rights after viewing only two pallets. However, it is undisputed that CExchange at the same time chose not disclose a spreadsheet it had received from Best Buy that graded the merchandise as Grade D. Under this circumstance, Top was not estopped from seeking to enforce the contract. *Cf. Frazier v. Wynn*, 472 S.W.2d 750, 753 (Tex. 1971) ("[T]there can be no . . . estoppel from acceptance of the benefits by a person who did not have knowledge of all material facts."). Accordingly, we conclude that the evidence was legally insufficient to support the submission of an estoppel instruction.

### C. Disclaimer of Warranty

CExchange contends the jury's finding in response to Question 4—that "the express warranties were disclaimed"—rendered all of its other findings immaterial. As an initial matter, we agree with Top that the issue of disclaimer is an inferential rebuttal that should be submitted in the form of an instruction rather than a jury question. *See GJP*, 251 S.W.3d at 886–87 (holding that a seller's assertion of an "as is" clause is an inferential rebuttal that should be submitted as an instruction to a liability question). Moreover, even if Question 4 were proper, we conclude the jury's DTPA findings made the "as is" and "no warranty" provisions unenforceable, thereby rendering the jury's disclaimer finding in response to Question 4 immaterial. *Menchaca*, 545

S.W.3d at 506. Accordingly, we conclude that the jury's finding on Question 4 did not defeat Top's warranty claim.

### D.    Predicate Instructions

CExchange next argues that Questions 5 and 9 in the charge should have been predicated on specific answers to certain preceding questions. Question 5 asked whether "the failure, if any, of Exchange to comply with a warranty was a producing cause of damages to Top Wireless. CExchange contends that the charge should have instructed the jury not to answer this question unless it answered "no" to the preceding question, which asked whether "the express warranties were disclaimed." Question 9 asked what sum of money, if any, would fairly and reasonably compensate Top for its damages, if any, that resulted from CExchange's conduct. CExchange contends that this question should have been predicated on a "yes" answer to the charge's breach of warranty questions (Questions 3 and 5), and on a "no" answer to its disclaimer question (Question 4).

Top responds that CExchange did not object to the foregoing instructions, thereby waiving its complaint. At the beginning of the charge conference, and before the parties had made their objections to the charge, the court preemptively overruled any objection that the charge (i) included language that neither party had proposed, or (ii) excluded language that either party had proposed. CExchange's proposed charge did not include the predicate instructions that it claims should have been included in the charge. Accordingly, the court's preemptive ruling did not preserve CExchange's complaint regarding these missing instructions. Moreover, while CExchange objected to the inclusion of any question in the charge beyond breach of contract, it did not object to the form of the questions as they were actually submitted. We conclude that CExchange waived its complaint by failing to object to the form of Questions 5 and 9, TEX. R. CIV. P. 274, and by

–20–

failing to propose the predicate instructions that it now claims the court should have submitted, TEX. R. CIV. P. 278.

We also agree with Top's contention that CExchange was not harmed by the missing instructions even if the court erred by not including them. Specifically, the jury's breach of contract and DTPA findings independently supported its award of damages, thereby rendering harmless the lack of a predicate instruction in Questions 5 and 9. *See Boatland of Houston, Inc. v. Bailey*, 609 S.W.2d 743, 750 (Tex. 1980), *superseded by statute on other grounds as stated in Smith v. Aqua-Flo, Inc.*, 23 S.W.3d 473, 478 (Tex. App.—Houston [1st Dist.] 2000, pet. denied) ("Generally, error in the submission of an issue is harmless when the findings of the jury in answer to other issues are sufficient to support the judgment.").

### E.    Proportionate Responsibility – DTPA Claim

CExchange's proposed charge instructed the jury, if it found that CExchange violated the DTPA, to determine whether the negligence, if any, of Top proximately caused Top's injury. Its proposed charge further instructed the jury, if it answered "yes" to each of the foregoing questions, to apportion the parties' responsibility. The court denied these proposals. CExchange challenges the court's ruling based on section 33.002(a)(2) of the Civil Practice and Remedies Code, which provides that chapter 33 of the Code applies to "any action brought under the Deceptive Trade Practices-Consumer Protection Act[8] . . . in which a defendant . . . is found responsible for a percentage of the harm for which relief is sought." It also cites section 33.003(a) of the statute, which provides that the jury, as to each cause of action asserted,[9] must determine the percentage of responsibility between specified persons that include each claimant and defendant.

---

[8] The Deceptive Trade Practices-Consumer Protection Act is located in Subchapter E, Chapter 17 of the Business and Commerce Code. *See* TEX. BUS. & COM. CODE ANN. §§ 17.41–63.

[9] It is undisputed that chapter 33 does not apply to Top's breach of contract or express warranty claims.

### 1. Wording of proposed questions

Top urges that CExchange's proportionate responsibility questions were not in substantially correct form, thereby waiving its complaint regarding the court's refusal to include such questions in the charge. TEX. R. APP. P. 278; *Barnett*, 123 S.W.3d at 824. Top notes that the affirmative defense of contributory negligence has been replaced by Texas's proportionate responsibility scheme, *Austin v. Kroger Texas, L.P.*, 465 S.W.3d 193, 209–10 (Tex. 2015), and it cites authority holding that contributory negligence may not be used to defeat recovery under the DTPA, *Frank B. Hall & Co. v. Beach, Inc.*, 733 S.W.2d 251, 264 (Tex. App.—Corpus Christi–Edinburg 1987, writ ref'd n.r.e.). It also quotes the Texas pattern jury charge for negligence and intentional tort cases. This charge contains a multi-part question that requires the jury to determine whether the negligence, if any, of each defendant and each plaintiff, among other specified persons, proximately caused the injuries in question. Comm. on Pattern Jury Charges, State Bar of Tex., *Texas Pattern Jury Charges: General Negligence, Intentional Torts, and Worker's Compensation* PJC 4.1 (2018). The pattern charge also instructs the jury that, if it answers "yes" for more than one of such persons, then it must find the percentage of responsibility attributable to each. *Id.* at PJC 4.3. Top faults CExchange's predicate liability question for "fail[ing] to mention [Top's] liability for its DTPA claim or include CExchange as a liable defendant."

Using the foregoing pattern jury charge provisions as a guide, CExchange's proposed charge could have incorporated the issue of Top's negligence into a single broad-form DTPA liability question, as opposed to CExchange's proposed question that separately inquired whether Top's negligence proximately caused its injuries. *See Keetch v. Kroger Co.*, 845 S.W.2d 276, 281 (Tex. App.—Dallas 1990), *aff'd*, 845 S.W.2d 262 (Tex. 1992) ("The Texas Pattern Jury Charges are nothing more than a guide to assist the trial courts in drafting their charges; they are not binding on the courts."). Nevertheless, CExchange's proposed questions would have accomplished the

same end had they been included in the court's charge. Assuming the jury answered "yes" to both Question 6 in the charge and CExchange's predicate liability question, then CExchange's proportionate responsibility question would have required the jury to determine the percentage of each of CExchange's and Top's responsibility for Top's injury. Under this circumstance, we conclude that CExchange's questions were substantially correct, *Barnett,* 123 S.W.3d at 824, and thus CExchange preserved its complaint for our review.

### 2. *Evidentiary sufficiency*

Top also urges that the evidence was insufficient to justify CExchange's proposed questions. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 33.003(b) (prohibiting the "submission to the jury of a question regarding conduct by any person without sufficient evidence to support the submission."). Top notes that its "decision not to inspect the full lot of Beats returns" was the only evidence that CExchange cited to support the submission of the foregoing jury questions. Top argues that this evidence did not justify the inclusion of CExchange's proposed questions. As support, Top relies on case law holding that "[w]here one has been induced to enter into a contract by fraudulent representations, the person committing the fraud cannot defeat a claim for damages based upon a plea that the party defrauded might have discovered the truth by the exercise of proper care." *Trenholm v. Ratcliff*, 646 S.W.2d 927, 933 (Tex. 1983) (citation and internal quotation marks omitted).[10] CExchange counters that the cases cited by Top predate the modern iteration of chapter 33 and that the statute required the submission of proportionate responsibility questions in this case.

---

[10] *See also Koral Indus., Inc. v. Security-Conn. Life Ins. Co.*, 788 S.W.2d 136, 146 (Tex. App.—Dallas 1990), *writ denied*, 802 S.W.2d 650 (Tex.1990) (per curiam) ("[A] jury finding that the defrauded party, by the exercise of reasonable diligence, should have known of the false representations is immaterial."); *West v. Carter*, 712 S.W.2d 569, 574–75 (Tex. App.—Houston [14th Dist.] 1986, writ ref'd n.r.e.) (holding there was no credible evidence that plaintiff knew of false representations, and jury's finding that plaintiff, by the exercise of reasonable diligence, should have known was immaterial).

Although the foregoing cases establish that a plaintiff's negligence is not a complete defense to fraud, the issue of proportionate responsibility is a statutory matter. *Isaacs v. Bishop*, 249 S.W.3d 100, 116–17 (Tex. App.—Texarkana 2008, pet. denied) (op. on rehearing). "Our objective in construing a statute is to give effect to the Legislature's intent, which requires us to first look to the statute's plain language." *ExxonMobil Pipeline Co. v. Coleman*, 512 S.W.3d 895, 899 (Tex. 2017) (per curiam) (citation and internal quotation marks omitted). If this "language is unambiguous, we interpret the statute according to its plain meaning," and "[w]e presume the Legislature included each word . . . for a purpose and that words not included were purposefully omitted." *Id.* (citation and internal quotation marks omitted).

Chapter 33 on its face applies to claims, including Top's DTPA claim, brought under section 17.46 of the Business and Commerce Code. The statute contains no exception that would render it inapplicable here. *See Dugger v. Arredondo*, 408 S.W.3d 825, 832 (Tex. 2013) ("When the Legislature intends an exception to Chapter 33's broad scheme, it creates specific exceptions for matters that are outside the scope of proportionate responsibility."). In this case, the court's charge should have included questions that required the jury to determine whether Top's negligence contributed to its injury. TEX. CIV. PRAC. & REM. CODE ANN. § 33.003(a); *see Isaacs*, 249 S.W.3d at 116–18 (rejecting plaintiff's contention that trial court erred by reducing his fraud-based damages award, based on application of chapter 33, by the percentage of plaintiff's negligence). The court erred in refusing to submit such questions.

We next consider whether the court's error requires reversal. "An error in the charge is reversible only if harmful, that is, if it was reasonably calculated to cause and probably did cause the rendition of an improper judgment." *See Thedford Crossing, L.P. v. Tyler Rose Nursery, Inc.*, 306 S.W.3d 860, 867 (Tex. App.—Tyler 2010, pet. denied). In this case, the jury's breach of contract and express warranty findings were themselves sufficient to support its award of damages

to Top. However, neither of these findings supported the jury's award of attorney's fees. While Top sought fees with respect to its breach of contract claim, the applicable statute, Civil Practice and Remedies Code section 38.001(8), does not apply here because CExchange is a limited liability company. *Varel Int'l Indus., L.P. v. PetroDrillbits Int'l, Inc.*, No. 05-14-01556-CV, 2016 WL 4535779, at *7 (Tex. App.—Dallas Aug. 30, 2016) (mem. op.). Top also sought recovery of fees with respect to its DTPA claim, TEX. BUS. & COM. CODE ANN. § 17.50(d), and the court awarded Top's fees in connection with this claim. In this circumstance, we hold that the court's erroneous refusal to include proportionate responsibility questions in its charge was harmful with respect to Top's claim for attorney's fees predicated on its DTPA claim. We sustain CExchange's complaint regarding this error but otherwise overrule its third issue. We conclude that Top's DTPA claim must be remanded for a new trial for the purpose of determining each party's proportionate responsibility for Top's injury and the impact of such apportioned responsibility on the fees to be awarded to Top.

## IV.    Attorney's Fees

CExchange's fourth issue contends the court erred in awarding attorney's fees to Top. It challenges the sufficiency of the evidence to support the fee award, based on the argument that Top's fees were unreasonable, unnecessary, and excessive. We need not consider this issue given our determination that Top's DTPA claim, on which its attorney's fee award was based, must be remanded for a new trial.

**CONCLUSION**

We reverse the court's judgment with respect to Top's DTPA claim and its claim for attorney's fees. We remand the cause for a new trial with respect to these claims. We otherwise affirm the judgment.

/David L. Bridges/
DAVID L. BRIDGES
JUSTICE

171318F.P05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

CEXCHANGE, LLC, Appellant

No. 05-17-01318-CV      V.

TOP WIRELESS WHOLESALER,
Appellee

On Appeal from the 14th Judicial District
Court, Dallas County, Texas
Trial Court Cause No. DC-16-02705.
Opinion delivered by Justice Bridges.
Justice Richter participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED** in part and **REVERSED** in part. We **REVERSE** the trial court's judgment with respect to appellee's Deceptive Trade Practices Act claim and its claim for attorney's fees. We **REMAND** the cause for a new trial with respect to these claims. In all other respects, the trial court's judgment is **AFFIRMED**.

It is **ORDERED** that each party bear its own costs of this appeal.

Judgment entered this 23rd day of August, 2019.